DOW et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.    September 13, 1897.)

No. 922.

1. VIOLATION OF NATIONAL BANK LAWS—MISAPPLICATION OF FUNDS—FICTITIOUS CHECKS.

An indictment under Rev. St. § 5209, against officers of a national bank and a depositor, charged willful misapplication of the funds of the bank, with intent to injure and defraud the bank. On the trial it appeared that the depositor made and deposited fictitious checks, which were credited to his account. *Held*, that it was necessary to show that some portion of the funds were withdrawn from the possession or control of the bank, or a conversion in some form was made thereof, so that the bank would be deprived of the benefit thereof.

2. SAME—INSTRUCTIONS—STATE STATUTES.

In such a case, a statement by the court to the jury that under a state statute it is made a misdemeanor to draw a check on a bank where there are no funds to meet it, tends to mislead the jury, and constitutes error.

3. SAME—OVERDRAFTS.

The mere fact of payment by the officers of a national bank of a check which creates an overdraft does not necessarily constitute a fraudulent misapplication of the funds of the bank.

4. SAME—EVIDENCE.

Under such an indictment, where the issues involve the intent with which certain acts were done, the trial court is justified in giving a reasonably wide latitude to the introduction of evidence tending to show the relations of the parties, the mode in which the business was carried on, and the knowledge which the officers had of the character of the operations carried on by the depositor.

5. SAME—FALSE ENTRIES—OVERDRAFTS.

If, in an indictment under Rev. St. § 5209, it is the purpose of the government to charge the making of false entries in the books of the bank because of the receiving and crediting of checks drawn thereon by parties who had no funds there, the indictment should set forth a description of the checks, with an averment of the reasons why they were to be deemed false or valueless.

6. SAME.

If an overdraft is made and allowed under circumstances justifying it, or even under circumstances making it a fraud upon the bank, the entry of the transaction just as it occurred on the books of the bank is not a false entry, under Rev. St. § 5209.

In Error to the District Court of the United States for the District of Colorado.

From the record in this case it appears that in 1893, and for some years previous thereto, Charles H. Dow was the president and Sidney B. McClurken was the receiving teller of the Commercial National Bank of Denver, Colo., and Orlando E. Miller was the president of the Miller Hernia Treatment Company, the headquarters of this company being in the city of Denver. On the 18th day of July, 1893, the named bank closed its doors, and its affairs were placed in the hands of a receiver, appointed by the comptroller of the currency. Upon an examination of its books, it appeared that Miller and the Hernia Treatment Company were indebted to the bank in the sum of $125,000, or nearly so; the capital stock of the bank being $250,000. According to the testimony of O. E. Miller, he began doing business with the Commercial National Bank in 1891, and it follows, therefore, that in the space of two years, he had drawn from the bank the sum of $125,000 in excess of any payments made to the bank during this period. The general mode in which the business was carried on is described in the testimony of Miller, from which it appears that during several months preceding the closing of

the bank it was his daily custom to make deposits of checks signed in the name of other parties, but not in fact drawn against funds in the bank, and also to deposit checks drawn upon other banks located in Denver; or, to use the language of Miller, when giving his testimony: "In November and December, when Eastern bills began to press, and our collections were slow, I would pay or cause to be paid off through the Commercial or some of these banks, particularly the Commercial, these outside claims, and would carry it along in a kite. During November I wanted some three or four thousand dollars that had gone beyond what we had money to deposit. Then in December it commenced to enlarge, and I borrowed money from the various brokers here, who had loaned me money before. I would carry along these amounts in a kite until it would get from five to ten thousand, then borrow the money from some of the brokers, and take the kite up. Then, after a while, their loans would fall in, and I would have to pay them. Then an Eastern demand would come in, and I would give a check on the Commercial. When that reached the Commercial, I would check on the American in order to gain time; next day give the American a check on the First, the next day a check on the People's to the First, and then give a check to the People's on the Commercial, taking four or five days in rounding up that check; and as the claims came in they kept adding to the kite, and kept growing larger and larger until it reached its highest point on the 12th of May. On that day I owed the Commercial National something like $125,-000, including the amount they paid through the clearing house on that date, which was $50,000." The evidence also shows that Miller was in the habit of depositing almost daily checks drawn by third parties, largely on the Commercial National, which, however, were not drawn against funds actually in the bank, but the same were credited up in the Miller account, which in this way was caused to show a large amount to the credit of that account, when in fact no such sum belonged to the Miller Company; and against this fictitious balance certified checks were given to Miller, and, being by him transferred to third parties, the bank was obliged to pay them.

At the May term, 1893, of the district court for the district of Colorado, three indictments, based upon the provisions of section 5209 of the Revised Statutes of the United States, were returned by the grand jury of that district against Dow, McClurken, and Miller, two of which, being numbered 1,273 and 1,301, charged the defendants with the illegal misapplication of the funds of the Commercial Bank, and the other, numbered 1,302, charged the making of false entries on the books of the bank. In the several counts —five in number—of the indictment numbered 1,273, Dow is charged as the principal, and the other two as aiders and abettors; and in indictment numbered 1,301, containing four counts, Dow and McClurken are charged as principals, and Miller as an abettor; and in the third indictment, numbered 1,302, containing four counts, McClurken is charged as principal, and the other two as abettors. By order of the court, indictments Nos. 1,301 and 1,302 were consolidated with No. 1,273, and the government was required to file a bill of particulars with respect to the items relied on in support of the allegations contained in the several counts charging a misapplication of the funds of the bank. At the November term, 1896, of the district court in Colorado, the consolidated indictments came on for trial before the court and jury, and a general verdict of guilty was returned by the jury, and subsequently sentences of imprisonment were entered against each of the parties hereinbefore named, and thereupon they united in suing out a writ of error, bringing the case to this court, and they now rely, for a reversal of the judgments entered, upon alleged errors in the admission and rejection of evidence, and in the instructions of the court upon the law of the case.

Charles Hartzell, George P. Steele, and Alexander McArthur, for plaintiffs in error Chas. H. Dow and Sidney B. McClurken.

E. L. Wells, M. F. Taylor, and John G. Taylor, for plaintiff in error Orlando E. Miller.

Greeley W. Whitford, U. S. Dist. Atty., and Henry V. Johnson, Special Asst. U. S. Dist. Atty.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge, after stating the case as above, delivered the opinion of the court.

The principal point relied on by plaintiffs in error in support of their contention that the trial court erred in the view of the law taken by it with respect to the counts charging a misapplication of the funds of the Commercial Bank is based upon those portions of the charge wherein it was said that:

"From the first hour that he (Dow) knew of this account,—knew that the checks drawn by Mr. Miller were false and fictitious,—if he allowed them to be accepted in his bank, he thereby confessed his guilt, under this statute, of misapplying the funds of the bank. I say to you, gentlemen, that every check presented by Mr. Miller, whether upon this bank or any other bank, with knowledge on the part of Dow and McClurken, and with their assent, upon which he received credit in the bank, was a direct and flagrant misapplication of the funds of the bank in defiance of this law."

The statute thus referred to, being section 5209 of the Revised Statutes, was before the supreme court for construction in the cases of U. S. v. Britton, 107 U. S. 655, 2 Sup. Ct. 512, and U. S. v. Northway, 120 U. S. 327, 7 Sup. Ct. 580, and it was therein held "to be of the essence of the criminality of the misapplication that there should be a conversion of the funds to the use of the defendant, or some person other than the association, with intent to injure and defraud the association, or some other body corporate or natural person." In the several counts in the indictments charging a misapplication of the funds of the Commercial National Bank it is averred that the misapplication was made with the intent to injure and defraud the association, meaning the national bank, and it is clear, under the ruling of the supreme court in the cases just cited, that the charges of misapplication contained in these indictments could not be made out unless it appeared that the funds of the bank had been depleted, withdrawn, or diminished in some form by reason of the action of Dow, aided and abetted by McClurken and Miller. The jury were instructed that the fact that Miller received credit in his account on the books of the bank for checks drawn on that bank or on other banks constituted a flagrant misapplication of the funds of the Commercial Bank, within the meaning of section 5209; yet it is apparent that merely giving credit to Miller on the books of the bank for the amount of the checks did not lessen the funds held by the bank, nor in fact defraud the association, in any form. To complete a misapplication of the funds of the bank, it was necessary that some portion thereof should be withdrawn from the possession or control of the bank, or a conversion in some form should be made thereof, so that the bank would be deprived of the benefit thereof. It is not necessary in all cases that the money should be actually withdrawn from the bank. Thus if, by connivance between a bank official and a customer of the bank, the latter is allowed to draw checks on the bank, when the drawer has not the funds to meet the checks, and the same are given by the drawer to third parties in payment of claims due them, and the third parties, instead of getting the cash on the checks, have them cred-

ited up to their accounts in the bank, this completes the misapplication of the funds of the bank, because the bank has become bound for the payment of the sums thus credited to the third parties; and the result is just the same as though the holders of the checks had obtained the money thereon, and had subsequently deposited it to their credit. In such cases the funds of the bank would be lessened, and thereby the criminal misapplication might be completed. If, however, the customer presents the checks himself, and has the same credited on his account, the crime of misapplication is not completed thereby, because the bank is not under legal obligation to pay out any of the amounts wrongfully credited to the customer, and may refuse to pay checks drawn against the inflated account, and may at any time charge back against the customer the amounts of the checks upon which nothing was in fact realized by the bank. To complete the criminal misapplication of the bank funds in the supposed case, some sum must be paid by the bank to the customer, or to third parties on his order, or must be credited to third parties under such circumstances that the bank becomes bound for the payment thereof. If the jury had been instructed that, if the evidence showed that Dow, as president of the bank, had knowingly permitted Miller's account with the bank to be inflated by crediting him with large amounts of false or fictitious checks, or checks drawn by parties who had no funds in the bank against which to draw, and Dow had furnished Miller with certified checks on the Commercial Bank, or had otherwise permitted him to draw large sums from the bank, so that in fact the funds of the bank had been depleted or withdrawn, and this was done under circumstances showing an intent on part of Dow to defraud the bank by thus allowing its funds to be depleted, a case of misapplication of the funds, within the meaning of the statute, had been made out, no just exception could have been taken thereto. The positive instruction, however, that merely crediting up on Miller's account the checks in question amounted to a misapplication of the funds of the bank, within the meaning of the statute, was clearly contrary to the construction placed on the statute by the supreme court, and we are compelled, therefore, to sustain the exceptions taken to the several parts of the charge, wherein it was stated that the reception and crediting of the checks on Miller's account constituted a violation of the statute; and, as these parts of the charge were directed to the very gravamen of the counts charging a misapplication of the funds, the error therein was material, and necessitates the granting of a new trial in the case.

Exceptions were also taken to that portion of the charge wherein the court called the attention of the jury to the fact that by the provisions of a statute of the state of Colorado it was made a misdemeanor for any one to draw a check or checks on a bank in which he had no funds to meet the check or checks. The criminality of the acts done by Dow were to be measured by the provisions of the statute of the United States, and, unless these acts came within the prohibition of the federal law, a verdict of guilty could not be rendered in this case on the ground that the provisions of the statute of Colorado were violated by the defendants. It is doubtless true that

the trial court referred to the Colorado statute merely as an illustration of the general proposition laid down in the instruction to the effect that drawing checks on a bank wherein the drawer has no funds is an attempt to obtain money by deceit and false pretenses. The danger, however, is in the fact the jury might infer therefrom that, as the drawing a check on a bank wherein there were no funds to meet it was forbidden by the statute of Colorado, the drawing of such a check and the crediting it to the account of the drawer constituted an actual misapplication of the funds of the bank, within the meaning of section 5209, which would be clearly contrary to the ruling of the supreme court in the cases already cited. The reference to the state statute is therefore open to the criticism that it was liable to mislead the jury. Furthermore, in the instruction excepted to, the court stated that:

"If there were no statute on the subject, the drawing of a check upon a bank where there are no funds is an attempt to get money by false pretenses. It is an attempt to get money by deceit. It is swindling; that is what it amounts to,—it is swindling. And if the check is in any manner paid, the man who does it is a swindler; and if it is done with the knowledge of the bank officers, and they assent to it, and recognize the checks when drawn, they are in the same category. They also participate in the fraud."

From this broad statement upon the subject, given without restrictions or qualifications, the jury might well understand that in all cases the drawing of a check, when at the time the drawer had no funds to meet it, would be a fraud on part of the drawer, and the recognition of the check by the bank officials, by crediting it to the account of the holder, would constitute a criminal misapplication of the funds of the bank, yet it is apparent that in many cases such acts would not be justly open to the charge of fraud, and in no case could they constitute a criminal misapplication of the funds of the bank, unless the funds of the bank had been lessened thereby. In nearly all cases wherein overdrafts occur, checks are drawn on the bank when in fact the drawer at the time has no funds on deposit to meet the check; and yet not all overdrafts are frauds, nor do the officers of the bank necessarily become participants in a fraud simply because they give recognition to checks drawn by their customers which are in fact overdrafts, because drawn upon the bank when the drawer had not funds therein to meet the checks. Of course, frauds and criminal misapplications of bank funds by the officials thereof may be committed by the recognition or payment of checks drawn on the bank when there are not funds to meet the same; but the criminal wrong, including the intent, must appear from all the facts surrounding the transaction, and cannot be inferred, as a matter of law, from the mere fact that when the check was drawn there were not funds on deposit to meet the check; and the charge given the jury in this case on this subject must be held misleading and erroneous because it is so broadly stated as to justify the jury in believing that the mere drawing of a check creating an overdraft is a fraud on part of the drawer, and the payment thereof by the bank officers of necessity constitutes a fraudulent misapplication of the funds of the bank.

Error is also assigned on the action of the court in admitting evidence tending to show the condition of the accounts of the Miller Hernia Company with the Commercial National Bank, and various transactions in which the defendants were participants at times previous to May 16, 1893, on the ground that the period of limitation prescribed by the act of congress adopted April 13, 1876 (19 Stat. 32), to wit, three years, would bar the application of the indictments to acts happening at dates more than three years before the finding of the indictments. The jury were expressly instructed that they were confined to the consideration of the items or transactions named in the bill of particulars, all of which are within the statutory period; and, as the limitation does not apply to evidence submitted in support of the charges in an indictment, it is clear the exception is not well taken on this ground, nor for the further reason urged that the evidence was not directed to the particular items covered by the indictments. The issues involved the intent with which certain acts were done, and the trial court was justified in giving a reasonably wide latitude to the introduction of evidence tending to show the relations of the parties, the mode in which the business was carried on, and the knowledge which the officers of the bank had of the character of the operations carried on by Miller, and which resulted so disastrously to the bank. Coffin v. U. S., 162 U. S. 664, 673, 16 Sup. Ct. 943.

Exceptions were also taken on the trial, and error is now alleged upon the construction placed by the court on counts 3 and 4 of indictment No. 1,302, wherein it is charged that McClurken made certain false entries in the books of the bank, it being charged in the third count that under date of June 22, 1893, McClurken, as receiving teller, had entered in his cash book that the cash items received on that day amounted to $26,011.75, whereas in fact they amounted to only $11.75; and in the fourth count it is charged that McClurken, as receiving teller, made an entry showing that on the 27th day of June, 1893, the cash items received amounted to $27,469.05, whereas in fact there had been received in cash items the sum of $469.05 only. The evidence showed that on each of the named days checks and cash to the amount of the entry were received by the teller, but a large part of the checks were drawn upon the Commercial National Bank by Miller and other parties, having at the time no funds in the bank, and the court charged the jury that McClurken, as receiving teller, could know, "and it was his duty to know, whether they were good checks or not. So that, if you believe from the evidence that he accepted as any part of this amount the false and fictitious checks, and gave credit upon them in this entry upon his books, I say to you that that entry is false and fictitious within the meaning of the law." It is the settled rule that indictments should be free from ambiguity, and be so expressed as to leave no doubt in the mind of the court and of the accused of the exact offense intended to be charged, and the general character of the facts upon which the government bases the case; for, unless this is done, the accused is not advised of the matters which he is required to meet in defending himself. U. S. v. Carll, 105 U. S. 611; U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Hess, 124 U. S. 483, 8 Sup. Ct. 571; Evans v. U. S., 153 U. S. 584, 14 Sup.

Ct. 934, 939. If it was the purpose of the government to charge the making of false entries in the books of the bank, for the reason that the receiving teller received and credited checks drawn on the bank by parties who had no funds in the bank, the correct rule of pleading would require the setting forth in the indictment of a description of the checks which it was claimed were fictitious or fraudulent, with an averment of the reasons why they were deemed to be false or valueless, in order that the accused might know that the character of the checks was attacked. In the third and fourth counts of indictment No. 1,302 the direct charge is that the entries of cash showed certain amounts, whereas in fact the cash items were very much less. The language used in these counts, taken in its ordinary meaning, charges that the falseness of the entry consists in largely overstating the total amount of cash items, whereas the court instructed the jury, in effect, that, even though checks and cash to the full amount of the entry made were in fact delivered to the receiving teller, and by him entered on the cash book, yet the entry would be false, if any portion of the checks so delivered turned out not to be good, thus making an issue with respect to the character of the checks, which is not made in the averments of the indictment. But, if it be admitted that it was open to the government to claim that the false entries charged in counts 3 and 4 could be sustained by evidence showing the depositing with the receiving teller of checks false or fictitious, nevertheless the instructions of the court upon this view of the case cannot be sustained, because the court expressly instructed the jury that McClurken, as receiving teller, "was bound to know the accounts of depositors, and whether the checks were good or not; and, if he received any of them which overdrew the account of the depositor, and gave credit upon that check to some other person, thereby he made a false entry in his books." In effect it was ruled that the reception and crediting to a third party of a check which created an overdraft was the making of a false entry on the books of the bank. If an overdraft was permitted or arranged for, the entry of the transaction could not be a false entry, for it would only be making an entry as evidence of a transaction which had in fact taken place. The statute law, and that based upon the common custom of bankers, do not forbid overdrafts absolutely and under all circumstances. Certainly, if an overdraft is made and allowed under circumstances justifying it, it cannot be said that the entry on the books of the bank of the checks constituting the overdraft is a false entry; and, on the other hand, if an overdraft is in fact made and allowed, under circumstances which make the transaction a fraud upon the bank, the entry of the transaction just as it occurred is not a false entry. The portions of the charge to the jury relating to the making of false entries in the books of the bank come within the criticism found in the ruling of the supreme court in Coffin v. U. S., 156 U. S. 432, 15 Sup. Ct. 394, wherein it is said:

"Whilst we consider the charges asked were in some respects unsound, yet the exception reserved to the charge actually given by the court was well taken, because therein the questions of misapplication and of false entries were interblended in such a way that it is difficult to understand exactly what was intended. We think the language used must have tended to con-

fuse the jury, and leave upon their minds the impression that, if the transaction represented by the entry actually occurred, but amounted to a misapplication, then its entry exactly as it occurred constituted a false entry; in other words, that an entry would be false, though it faithfully described an actual occurrence, unless the transaction which it represented involved full and fair value for the bank. The thought thus conveyed implied that the truthful entry of a fraudulent transaction constitutes a false entry within the meaning of the statute. We think it is clear that the making of a false entry is a concrete offense, which is not committed where the transaction entered actually took place, and is entered exactly as it occurred."

For these reasons the judgment and sentences entered by the trial court must be reversed, and the case is remanded to the district court of Colorado, with instructions to grant a new trial.