## MOHRENSTECHER et al. v. WESTERVELT.

(Circuit Court of Appeals, Eighth Circuit. March 21, 1898.)

### No. 924.

1. APPEAL AND ERROR—DECISIONS ON PRIOR APPEAL.
When a case goes twice to an appellate court, questions decided upon the first occasion will not be considered upon the second.

2. INSTRUCTIONS—CURING ERROR.
Error in denying a motion to compel the plaintiff to elect between causes of action is cured by instructions eliminating all but one cause.

3. SAME—BANK CASHIER—MISAPPLICATION OF FUNDS.
It is error to give instructions authorizing the jury, in determining whether a transaction by which the cashier of a national bank obtained possession of some of its funds was a misapplication thereof, to consider the fact that his indebtedness to the bank exceeded 10 per cent. of its capital.

4. SAME—TRIAL.
Instructions that no devices for concealment, however elaborate, which a bank cashier may adopt to conceal a transaction amounting to a misappropriation of its funds, can protect him, are erroneous, when there is no evidence of any concealment whatever in respect to the transaction in question.

5. NATIONAL BANKS—EXCESSIVE LOAN—CASHIER'S BOND.
The making of a loan exceeding 10 per cent. of a national bank's capital, in the absence of fraud, is not a breach of the cashier's bond.

6. SAME—MISAPPLICATION OF FUNDS—RENEWAL OF NOTES.
To constitute a misapplication of the funds of a bank, it is necessary that some portion thereof shall be withdrawn from its possession or control, or that some conversion be made, so as to deprive the bank of the benefit thereof. Mere renewal of notes already in the bank's possession does not, of itself, constitute a misapplication of funds.

7. SAME—ESTOPPEL.
The cashier of a bank having made large purchases of real estate, one of the sureties on his bond made inquiries of several officers of the bank, actively engaged in its affairs, as to whether the cashier had borrowed money of the bank in order to make such purchases, and was informed that the purchases were for the benefit of the bank, that no liability accrued therefrom to the cashier to the bank, and that the cashier's total indebtedness to the bank was but a few hundred dollars. *Held*, that the bank was estopped subsequently to deny these statements, when the sureties had relied thereon, and the cashier had in the meantime become insolvent.

8. APPEAL—HARMLESS ERROR.
In a suit upon a bank cashier's bond, one of the sureties thereon was not allowed to testify to statements of bank officers in reference to the cashier's dealings with the bank, but the cashier himself was afterwards permitted to testify to practically the same effect as the testimony offered. *Held*, that the rejection was not harmless error, as the evidence could not be considered merely cumulative, in view of attacks made upon the cashier's credibility, and of his interest in misrepresenting his transactions, if illegal.

In Error to the Circuit Court of the United States for the District of Nebraska.

S. L. Geisthardt, C. C. Flansburg, and W. H. Thompson, for plaintiffs in error.

O. A. Abbott and John W. Blee, for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This is a writ of error to review a judgment of the circuit court of the United States for the district of Nebraska, which was entered upon a verdict in favor of the defendant in error,'for the sum of $10,000, with interest from September 25, 1894. The action was brought by Edgar M. Westervelt, receiver of the Citizens' National Bank of Grand Island, Neb., against George A. Mohrenstecher, Otto A. Mohrenstecher, Mary Mohrenstecher, William Stull, and A. W. Ocobock, upon a bond given by George A. Mohrenstecher, the cashier of the bank, as principal, and the other defendants as sureties. The petition contained three causes of action. In the first cause of action it was alleged, in substance, that the plaintiff was the duly-appointed receiver of the Citizens' National Bank of Grand Island, Neb., and that the defendant George A. Mohrenstecher was the cashier of the bank from the 13th day of August, 1889, until the bank suspended payment, on the 4th day of December, 1893; that as such cashier he executed the bond upon which this suit was brought; that the bond provided that Mohrenstecher, as cashier of the bank, should execute the duties thereof with integrity and fidelity, and should faithfully perform and fulfill the trusts thereby in him reposed, and well and truly, at all times when thereto required, account for and render over to the bank all moneys, goods, chattels, and other things, the property of the bank, 'that came into his hands, possession, or control, so that no default, fraud, or failure should happen or be occasioned by any neglect or failure on his part to perform his duties as such cashier. It was then alleged that Mohrenstecher failed to perform his duties as cashier, and on or about the 29th day of December, 1891, appropriated to his own use $10,365.82 of the moneys of the bank, in his custody and possession as cashier, and used and applied the same in payment of certain real estate before that time purchased in the joint names of himself and one Alexander H. Baker; that this money was appropriated by the cashier under the trick, device, and pretense of loaning various sums of money upon the joint and several notes of said cashier and one Alexander H. Baker and M. J. Baker. The second cause of action alleged that Mohrenstecher, disregarding his duties as cashier, loaned one Alexander H. Baker, on his own note, and jointly with others, a sum largely in excess of the sum of $6,000, of the moneys of said bank in his custody as cashier, viz. the sum of $18,522.95; that this indebtedness was evidenced by a note of Alexander H. Baker and M. J. Baker for the sum of $8,157.13, and two joint notes of Alexander H. Baker and George A. Mohrenstecher (being the notes mentioned and described in the first cause of action), amounting to the sum of $10,365.82. The third cause of action alleged that Mohrenstecher loaned to himself individually, and jointly with others, a sum greater than 10·per

cent. of the bank's capital stock, viz. the sum of $17,321.82; that this amount was evidenced by two notes aggregating $10,365.82, described in the first cause of action, and a note of George A. Mohrenstecher and Mary Mohrenstecher amounting to $5,990, and several smaller notes executed by George A. Mohrenstecher aggregating $966. The defendants filed separate answers. Each answer admitted the incorporation of the bank, its suspension of payment, the appointment of a receiver, the execution and delivery of the bond, and the signing and placing by Mohrenstecher, as cashier, among the bills receivable of the bank, of the two notes described in the first cause of action, aggregating $10,365.82, and denied each and every allegation in the petition contained, except those thereinbefore specifically admitted. The answers of three of the sureties, after making the above admissions and denial, alleged, in substance, that the term for which George A. Mohrenstecher was appointed cashier, by the action of the board of directors of the bank, terminated on the 4th day of January, 1890; that when Mohrenstecher was appointed cashier, and when his bond was given, he was indebted to the bank in an amount exceeding 10 per cent. of its capital stock; that this fact was known to the officers and directors of the bank, but was concealed from the sureties on the bond, with intent to mislead and defraud them; that when George A. Mohrenstecher was reappointed cashier, on the 14th day of January, 1890, he was indebted to the bank in an amount exceeding 10 per cent. of its capital stock, which the officers and directors knew, but of which the sureties on the bond were ignorant; that such reappointment, under the circumstances, was a fraud on the sureties; that the two notes complained of, aggregating $10,365.82, were in fact not a debt of the cashier, but represented a legitimate bank transaction, growing out of a purchase of certain real estate, known as the "Hurford Property," on January 25, 1890; that Mohrenstecher, as cashier, purchased the property on the date above mentioned for the benefit of the bank, for the purpose of realizing upon a claim which the bank held against Hurford; that the title was taken in his name and the name of Alexander H. Baker in trust for the bank; that the money used to pay for it was replaced by four promissory notes (one for $6,000 executed by the vice president, William Hagge; one for $6,000 executed by the teller, William Geddes; one for $6,000 executed by Richard Koenig, son of the president of the bank; and one for $4,250 executed by George A. Mohrenstecher and Alexander H. Baker); that a loan was afterward effected on the property, in the sum of $12,000, and the proceeds thereof were turned in to the bank, and used to cancel the notes of Geddes and Koenig; that thereafter a further sum of $5,000 was procured by Mohrenstecher and Baker for the benefit of the bank, and applied in partial satisfaction of the note of Hagge; that the notes for the remainder of the purchase price, evidenced by the notes still outstanding, were from time to time renewed, until, with the accumulation of interest and taxes, they amounted to the sum of $10,365.82, which sum was evidenced by the two notes mentioned in the first cause of action; that the notes mentioned in the first cause of action were, for a valuable

consideration, extended by the officers of the bank without the knowledge or consent of the sureties; that, soon after the Hurford property was purchased by Mohrenstecher, William Stull, on behalf of himself and the other sureties on the bond, proceeded to Grand Island, and there made inquiry of the cashier himself, also of the president and vice president of the bank, in regard to the transaction and the cashier's relation to the bank, and was informed by each of them that the Hurford purchase was a bank transaction, and not a private speculation on the part of the cashier; that it involved the cashier in no liability to the bank; that he owed the bank nothing, beyond a small, nominal sum; that nothing whatever had been done which involved them in any liability upon the bond; that Stull and the other sureties relied upon that information, and took no action to indemnify themselves; that Mohrenstecher at that time had ample property to secure the sureties for any loss which they might have incurred by reason of their suretyship, but at the time when this suit was brought, and ever since, he was and has been wholly insolvent, and that the receiver is now estopped, by reason of these facts, from claiming any liability upon the bond against the sureties; that, when the bond was executed by Mary Mohrenstecher, she was a married woman, and the bond was not signed by her with reference to, or upon the faith of, her separate estate; that under the laws of Nebraska she was thereby exempt from liability on the bond. This same defense is also set out in her answer. The answer of George A. Mohrenstecher was substantially the same as the answer of the sureties, in relation to the purchase of the Hurford property, and the execution of the notes described in the first cause of action. Replies putting in issue the new matter set up in the answers were duly filed. There was a trial, and verdict and judgment in favor of the plaintiff for the sum of $10,000 and interest. The case has been once before this court, on a writ of error sued out by the plaintiff in the circuit court to review a judgment rendered against him by that court upon the pleadings. 76 Fed. 118.

Numerous errors are assigned, but we shall not find it necessary to discuss them separately. Several of them raise the same questions presented to and decided by this court when the case was first before it. That these questions are not now open for re-examination is well settled. Balch v. Haas, 36 U. S. App. 693, 20 C. C. A. 151, and 73 Fed. 974; Thatcher v. Gottlieb, 19 U. S. App. 469, 8 C. C. A. 334, and 59 Fed. 872; Supervisors v. Kennicott, 94 U. S. 498; Clark v. Keith, 106 U. S. 464, 1 Sup. Ct. 568.

The court instructed the jury that the making of an excess loan, in the absence of fraud, would not of itself constitute a breach of the cashier's bond, that such fact was not material to the issues in the case, and that the jury should not give such fact any weight in arriving at a verdict; thereby eliminating from the controversy everything except the issues presented by the first cause of action. It becomes unnecessary, therefore, to consider the assignments of error by which it is sought to question the correctness of the ruling of the circuit court in denying the motion filed by the defendants to

require the receiver to elect upon which cause of action he would proceed. In view of the instructions given by the court to the jury at the trial, the defendants could in no way be prejudiced by the ruling upon the motion.

The following instruction given to the jury is assigned for error:

"But you are instructed that, under the law of the United States, national banks are prohibited from loaning to any person, company, corporation, or firm. or the several members thereof, a sum exceeding one-tenth part of the capital stock of such bank; and in this case, if you find from the evidence that the defendant George A. Mohrenstecher and one A. H. Baker got possession of the sum of $10,365.82 of the funds of the bank at a time when each of said persons was indebted to such bank in the sum of $6,000 or more, you may consider this fact, if proven, in connection with other facts and circumstances in evidence, in determining whether the transaction by which said Baker and Mohrenstecher got possession of $10,365.82 of the funds of the bank, if you find from the evidence they did so get possession of such funds, was a misappropriation of such funds by said George A. Mohrenstecher, the cashier of said bank."

We think this instruction was erroneous, in that it authorized the jury to consider the fact of an excess loan in determining whether the transaction by which Baker and Mohrenstecher got possession of $10,365.82 of the funds of the bank was a misappropriation of such funds by Mohrenstecher, the cashier, when such fact, if established, would not tend to show either deceit, fraud, or misappropriation.

It is also insisted that the court erred in refusing the request of the defendants to instruct the jury to return a verdict in their favor, and in giving the following instructions to the jury:

"And, when an officer converts money of a bank to his own use, he violates his duty; and no trick or device, however shrewd, will protect him in so doing. no matter how elaborate a system of notes and bookkeeping he may adopt. The law looks at the realities of the transaction, and will not allow a system adopted to hide the offense to protect the offender." "Therefore, no matter what acts were done by the cashier, Mohrenstecher, with reference to the notes in question, and disclosed by the evidence, if you find from the evidence, under these instructions, that such acts taken to conceal from the bank officials or the bank examiner the conversion by said George A. Mohrenstecher to his own use the money of the bank, if, under the evidence and these instructions, you find there was such conversion, you should disregard such acts, if any you find there were, designed to conceal, and find the fact of conversion to be fully proved."

The ground of objection to the two instructions just quoted is that they are misleading, and assume the existence of facts not proved. If the defendants are liable upon this bond, it is because Mohrenstecher, the cashier, misappropriated or misapplied $10,-365.82 of the bank's funds, as alleged in the first cause of action. To constitute a misappropriation, there would have to be a conversion of the funds of the bank, in some form, to the use of the cashier, or some person other than the bank, with the intent to injure and defraud the bank. If the notes described in the petition were merely renewals of other notes held by the bank, the fact that they were taken by the cashier in lieu of the old notes would not constitute a misappropriation or misapplication of the funds of the bank by him, for the reason that the funds of the bank were in no way withdrawn or diminished by his act. In Dow v. U. S., 49 U. S. App.

605, 27 C. C. A. 140, 82 Fed. 904, Judge Shiras, in delivering the opinion of the court, said:

"To complete a misapplication of the funds of the bank, it was necessary that some portion thereof should be withdrawn from the possession or control of the bank, or that a conversion, in some form, should be made thereof, so that the bank would be deprived of the benefit thereof." "It is not necessary in all cases that the money should be actually withdrawn from the bank. Thus, if, by connivance between a bank official and a customer of the bank, the latter is allowed to draw checks on the bank when the drawer has not the funds to meet the checks, and the same are given by the drawer to third parties in payment of claims due them, and the third parties, instead of getting the cash on the checks, have them credited up to their accounts in the bank, this completes the misapplication of the funds of the bank, because the bank has become bound for the payment of the sums thus credited to the third parties; and the result is just the same as though the holders of the checks had obtained the money thereon, and had subsequently deposited it to their credit. In such cases the funds of the bank would be lessened, and thereby the criminal misapplication might be completed. If, however, the customer presents the checks himself, and has the same credited on his account, the crime of misapplication is not completed thereby, because the bank is not under legal obligation to pay out any of the amounts wrongfully credited to the customer, and may refuse to pay checks drawn against the inflated account, and may at any time charge back against the customer the amounts of the checks upon which nothing was in fact realized by the bank. To complete the criminal misapplication of the bank funds in the supposed case, some sum must be paid by the bank to the customer, or to third parties on his order, or must be credited to third parties, under such circumstances that the bank becomes bound for the payment thereof."

The case cited was a criminal case, but the principle announced applies in this case. The burden was upon the plaintiff to show that Mohrenstecher by means of these notes wrongfully obtained money from the bank. If, by executing the notes and delivering them to the bank, he was either paid or took money from the bank, that fact was capable of proof by showing the reduced amount of the cash on the day it was taken. The evidence in the case tended to show that the notes executed on the 29th day of December, 1891, were renewal notes; that the indebtedness represented thereby had its origin in the purchase of the real estate known as the "Hurford Property" on January 25, 1890; that this real estate was purchased by the cashier on the 25th day of January, 1890, for the sum of $22,250; that the money used to pay for the property was represented by four notes (one for $6,000 signed by the vice president of the bank, William Hagge; one for $6,000 signed by the teller, William Geddes; one for $6,000 signed by the president's son, Richard Koenig; and one for $4,250 signed by Mohrenstecher and Baker); that subsequently a loan was made upon the property for the sum of $12,000, and the proceeds thereof turned in to the bank, and used to cancel the notes of Geddes and Koenig; that thereafter a further sum of $5,000 was obtained by Mohrenstecher and Baker, and applied as a part payment of the Hagge note; that the two notes, which aggregate the sum of $10,365.82, represented the balance of the purchase price of this property, the accumulations of interest, and the taxes. While the record shows that on the 31st of December, 1891, the cashier's check for the amount of the two notes ($10,365.82) passed through the bank, yet a careful examination of the record fails to show that the bank parted with any mon-

ey on that day. Upon the questions whether the two notes for $10,365.82 were renewals, and whether this check represented a cash transaction, the following questions and answers in the testimony of Henry A. Koenig, president of the bank, throw some light:

"Q. You may state what those are. A. Bill discount and discount slip. Q. Of what bank and date? A. Citizens' National Bank, and made on the 31st of December, 1891. Q. Now, with those slips in your hand, and from an examination of them, can you tell what went to make up the consideration of the note for $6,000 (No. 26,685), and the note for $4,365.82 (No. 26,686), or either of them? A. These are renewals. Q. Of other notes? A. Of other notes of the same party. Q. As a matter of fact, did these not renew other notes aggregating $9,452.70, and interest upon them of $913.12? A. Yes, sir.. Q. Do you know, of your own knowledge, whether this check was ever paid? A. I don't know. Q. Do you know, of your own knowledge, anything about the transaction testified to? A. I do not. Q. Do you know whether there was $10,-365.82 in cash paid out of the bank upon the check on that day? A. The books will show it. Q. Do you know? A. I don't know. Q. These discount slips that you have just testified to show that these were renewals,—Exhibits C and D were renewals of certain other notes? A. It looks like it, and the check shows that he has taken up old notes by it, because Mr. Mohrenstecher put it plain on the check himself. Q. As a matter of fact, this check says, 'Pay to the order of' certain other notes? A. Yes, sir. Q. And these are certain notes described in the discount slip and slip of bills discount? A. Yes, sir. Q. And these two notes were given in the place of those notes that were taken up? A. That I don't know. Q. That is what you infer from this transaction? A. Yes, sir. Q. I understand you to say that looking at these two notes, Exhibits C and D, and these discount tickets, you infer from the examination that these two notes took up the other notes mentioned here? A. Yes, sir."

The account of G. A. Mohrenstecher, agent, also shows that on December 31, 1891, a charge of $10,365.82 was exactly counterbalanced by credit for the same amount. Mohrenstecher, in his deposition, also testified that these notes were given for the balance of principal and the interest and accumulation of interest and taxes accrued upon the purchase of the Hurford property. This record, we think, fails to show a misappropriation of the funds of the bank at the time alleged in the petition; and if the plaintiff desired to rest his case upon the transaction of December 29, 1891, the defendants were entitled to the instruction requested. There was no evidence tending to show that there was any trick or device employed by the cashier with the intent and for the purpose of covering up and concealing the transaction complained of. On the contrary, the evidence shows that the notes mentioned in the first cause of action at all times appeared upon the books of the bank, were kept in a note case in the usual place in the bank, and were frequently examined by the directors and officers of the bank authorized to examine them, including the discount committee. The two instructions above quoted are therefore open to the criticism made by counsel.

At the trial the defendants offered to prove by the defendant William Stull: That in a conversation had with Mr. Koenig, the president of the bank, soon after the purchase of the Hurford property, he demanded information as to whether Mohrenstecher, the cashier, had borrowed money from the bank for the purpose of purchasing the property, and whether the bank claimed any liability at that time upon the bond by reason of any act of Mohrenstecher's

in borrowing money. That he was then assured by Koenig that he need give himself no uneasiness about the bond; that there was no breach of it, and that George was not interested in the property more than any other stockholder in the bank; that it was simply a bank deal, and it was bought by George under instructions of the president and vice president, Koenig and Hagge, for bank purposes. The defendants further offered to prove by the same witness that, after having the conversation with the president of the bank, he went to Hagge, the vice president, and asked him for information concerning the transaction,—as to whether it was a private transaction on behalf of Mohrenstecher, or a bank deal,—and the vice president informed him that it was a deal on behalf of the bank, and a bank transaction; that the title was simply taken for convenience in the name of George A. Mohrenstecher, the cashier. He also stated to the witness that there was no violation of the bond, or any breach thereof,—no liability claimed,—and 'that the bank intended to erect a building upon this property. The defendants further offered to prove by this witness that a short time after his visit to Grand Island he had a conversation with Mr. Abbott, one of the directors of the bank, and chairman of the finance or discount committee; that he inquired concerning Mohrenstecher's indebtedness to the Citizens' National Bank; that Abbott, in reply to his question, stated that Mohrenstecher did not owe the bank more than four or five hundred dollars; that he (Abbott) was chairman' of the finance or discount committee of the bank, and knew the facts. These offers were objected to, and the objections were sustained, to which the defendants excepted. We think this testimony should have been admitted. The conversations were had with the president, vice president, and a director of the bank, who was chairman of the finance or discount committee. There can be little doubt, from the record, that the two officers first named, together with the cashier, were engaged in the active management of the affairs of the bank. True, at one place in his testimony Mr. Koenig says that he did not devote personal attention to the business of the bank. He subsequently stated, however, that he did from time to time examine the bills discounted, and compared them with the books; and his testimony generally shows that he was very familiar with the business of the bank, and that he was consulted in relation to the purchase of this Hurford property, although his testimony and that of Mohrenstecher are not in harmony as to what was said upon that occasion. That Mr. Hagge, the vice president, was actively engaged in the management of the business of the bank from the time of its organization until its close is shown by the following question and answer in his testimony:

"Q. How much of that time were you actively engaged in the management of the bank's business? A. Well, I was there most of the time in the bank. Once in a while, of course, I had business outside."

In line with Mr. Hagge's testimony, the record of a meeting of the board of directors of the bank held on the 13th of October, 1891, after showing that all members of the board of directors were present, sets out at length a report made by the examining committee,

which was read and approved, in which the following statement appears:

"Your committee desire at this time to call the attention of the board to the fact that the assistant cashier and acting teller of the bank, the vice president and the president, who are engaged in the active management of the bank, have not given bonds in accordance with the by-laws and resolutions of the board."

If the statements contained in the offers by the defendants were made by the president, vice president, and the director, who was chairman of the finance or discount committee as therein stated, as against the sureties upon the cashier's bond, who, relying upon the information thus received from the officers of the bank, took no action to protect themselves against loss, the bank would be estopped to deny that the purchase of the Hurford property was a bank transaction, and that the title to the property was simply taken for convenience in the name of the cashier. In the case of Illinois Trust & Sav. Bank v. City of Arkansas City, 40 U. S. App. 257, 22 C. C. A. 171, and 76 Fed. 271, Judge Sanborn, delivering the opinion of the court, said:

"No principle is more universal in the jurisprudence of civilized nations, no principle is more equitable in itself, or more salutary in its effects, than that no one may, to the damage of another, deny the truth of statements and representations by which he has purposely or carelessly induced that other to change his situation." Paxson v. Brown, 27 U. S. App. 49, 10 C. C. A. 135, and 61 Fed. 874; Dickerson v. Colgrove, 100 U. S. 578; Kirk v. Hamilton, 102 U. S. 68.

That this principle applies to the transactions of corporations as well as to those of individuals is well settled. Zabriskie v. Railroad Co., 23 How. 381; Omaha Bridge Cases, 10 U. S. App. 98, 188, 190, 2 C. C. A. 174, 239, 244, and 51 Fed. 309; Butler v. Cockrill, 36 U. S. App. 702, 20 C. C. A. 122, and 73 Fed. 945. There was testimony tending to show that Mohrenstecher was solvent at that time, and had property sufficient to satisfy any liability which might accrue upon the bond. Stull, the surety, was entitled to a truthful answer to his inquiry in reference to Mohrenstecher's indebtedness to the bank. It was a matter in which he was vitally interested. If Mohrenstecher was improperly using the bank's funds for the purpose of purchasing real estate, the sureties upon his bond had a right to know that fact. These officers knew that Stull was a surety upon Mohrenstecher's bond, and the purpose of the inquiry could not be misunderstood. True, the cashier was allowed to testify upon this point, and his testimony was, in substance, the same as the proof offered and rejected. We do not think, however, that it can be said that the testimony offered was merely cumulative, and therefore the error was error without prejudice. The credibility of this cashier had been seriously attacked before the jury, and his interest in withholding correct information in regard to his own transactions, if they were illegal, would render his declarations of little value. The sureties upon this bond had taken every precaution to save themselves and the bank from loss. They had made timely inquiry of the officers of the bank engaged in the active management of its affairs, with reference to a transaction which might affect their liability as sureties upon the cashier's

bond. The assurances of these officers that the transaction was a bank matter, in which the cashier was merely the representative of the bank, and that he had done nothing whatever to subject himself and his sureties to any liability on his bond, were statements upon which these sureties clearly had a right to rely; and they offered this testimony for the purpose of showing that they did rely upon them, and by reason thereof were lulled into inactivity at a time when prompt action might have averted loss. The judgment of the circuit court must be reversed, and the case remanded, with directions to grant a new trial.