BISHOP v. UNITED STATES (two cases).
GATES v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.
November 29, 1926.)

Nos. 7494, 7526, and 7527.

1. Judges ☞51(2)—Affidavit of prejudice of judge held filed too late (Judicial Code, § 21 [Comp. St. § 988]).

It is the intent of Judicial Code, § 21 (Comp. St. § 988), providing for the filing of an affidavit of prejudice against the trial judge that it shall be filed in time to save useless costs, and a motion and affidavit filed by a defendant on the day the case was reached for trial, setting up facts known to his counsel at least four days previously, *held* properly denied.

2. Banks and banking ☞256(3)—"Misapplication of funds" and intent to injure bank must combine to constitute misapplication of funds of national bank (Comp. St. § 9772).

Two elements must combine to constitute the offense of "misapplication of funds" of a national bank, under Rev. St. § 5209 (Comp. St. § 9772): (1) Misapplication of funds of the bank; and (2) a willful and felonious intent to injure or defraud the bank.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Misapplication.]

3. Banks and banking ☞260(1)—National bank held liable for obligations of subsidiary corporation, which it controlled through stock ownership.

Where a former department of a bank was separately incorporated, its stock being issued to the bank, which fully controlled its affairs, and its account was still carried on the books of the bank as the insurance department, the bank *held* liable for its obligations.

4. Corporations ☞1—Where there is practical identity between corporation and another, which it owns and controls, courts will ignore separate legal entities.

Where one corporation is subsidiary to and owned and controlled by another, courts will look through mere names to learn the real relationship between the corporations, and if there is practical identity will disregard the formal separation into legal entities.

5. Banks and banking ☞257(3)—Evidence held not to sustain conviction of officers of national bank for criminal misapplication of funds.

Evidence *held* insufficient to sustain conviction of officers of a national bank for willful misapplication of its funds, where they were applied under advice of counsel in payment of claims for which there was at least a strong probability that the bank would have been held legally liable.

6. Banks and banking ☞260(1)—Merger contract between national and state bank held not ultra vires.

Contract of merger between national and state bank *held* not ultra vires, though national bank assumed liabilities of state bank, which also carried on insurance business.

7. Criminal law ☞560, 753(2)—Unless substantial evidence excludes every other hypothesis but guilt, court should instruct verdict for accused; evidence as consistent with innocence as guilt will not sustain conviction.

Unless there is substantial evidence of facts which includes every other hypothesis but that of guilt, it is the duty of the trial court to instruct a verdict for accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction.

In Error to the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

Criminal prosecution by the United States against Will F. Bishop, Frank L. Bishop, and Herman B. Gates. Judgment of conviction, and defendants bring error. Reversed and remanded.

See, also, 16 F.(2d) 406.

Kenneth W. Robinson and Harry S. Silverstein, both of Denver, Colo. (Philip S. Van Cise, of Denver, Colo., on the brief), for plaintiff in error Will F. Bishop.

S. Harrison White, of Denver, Colo., for plaintiff in error Frank L. Bishop.

Horace N. Hawkins, of Denver, Colo., for plaintiff in error Gates.

Ivor O. Wingren, Asst. U. S. Atty., of Denver, Colo. (George Stephan, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before KENYON, Circuit Judge, and SCOTT and JOHN B. SANBORN, District Judges.

KENYON, Circuit Judge. Plaintiffs in error were tried in the United States District Court for the District of Colorado upon an indictment charging in eight counts the violation of section 5209, Rev. Stat. of the United States (Comp. Stat. § 9772), by the misapplication of funds of the Globe National Bank of Denver. The first count related to the payment of taxes of certain customers of the Home Insurance & Investment Company of Denver, and the other seven counts related to the payment by the Globe National Bank, (hereafter referred to as the Globe Bank) of overdrafts of the same company upon checks drawn to various insurance companies to cover premiums collected by said Home Insurance & Investment Company (hereafter designated as the Investment Company.) Plaintiffs in error for convenience will be designated as defendants. Defendants Frank L. Bishop and Will F. Bishop were convicted on all eight counts. Defendant Herman B. Gates was convicted

on the first count and acquitted on the others. One Daniel H. Staley was also a defendant, but was acquitted by direction of the court. Defendant Frank L. Bishop was sentenced to 20 years in the penitentiary at Leavenworth, Kan., on the first four counts, and 20 years on the remaining counts, the sentences upon the last four counts to run concurrently with the first four. The defendant Will F. Bishop was sentenced to 17 years in the penitentiary, and the defendant Herman B. Gates to 9 months in the county jail. Fines were imposed of $8,000 as to Frank L. Bishop and $4,000 as to Herman B. Gates.

[1] Prior to the commencement, but on the day the case was reached for trial, defendants filed an affidavit under section 21 of the Judicial Code (Comp. St. § 988), setting forth that the judge before whom the action was to be tried had a personal bias or prejudice against them. The court overruled the application for another judge to try the case, and this is assigned as error. The affidavit of disqualification under the statute was not filed until the morning of the day the case was reached for trial, viz. March 23, 1926, which was after the date the case was set for trial. Immediately after the court's ruling thereon defendants filed a motion for continuance. A large number of witnesses had been subpoenaed by the government and were present for the trial. The reasons set forth in the affidavit as the basis of the complaint as to prejudice were known to the defendants for a long time prior to the date set for trial, except one, which came to their knowledge on the 19th day of March, 1926. The statute provides for filing the affidavit as to prejudice 10 days prior to the beginning of the term. This could not be done in this case, as the case was set for trial at the same term at which the indictment was returned. Three days before the trial, to wit, March 19th, the matter which finally determined counsel to file the affidavit came to their attention. The case was reached for trial March 23d.

It is the intent of the statute that the affidavit must be filed in time to protect the government from useless costs, and protect the court in the disarrangement of its calendar, and prevent useless delay of trials, and parties filing such affidavits should be held to strict diligence in presenting the claims of disqualification. There is no reason why this affidavit could not have been filed previous to the morning of trial, and at a time when the facts upon which it was to be based were fully known to defendants' counsel. Of course, if the facts were not known until the day of trial, it would then be in time; but where it clearly appears that practically all of them were known long prior thereto, and within ample time to have filed the affidavit before the day of trial, a party, by waiting until the day of the trial, evidences that the purpose of filing the same is delay. The spirit of the statute is thereby violated, and parties should not be permitted to reap therefrom the advantage of delay in trial. A new means of securing continuances would result from a holding that such affidavits of prejudice, where the facts are known long before, may be held until the last moment before trial and then filed.

This court has had occasion quite recently to consider this statute in two cases, viz. Heber Nations v. United States of America, 14 F.(2d) 507, and Lewis v. United States (C. C. A.) 14 F.(2d) 369. In the former case the question of the affidavit being filed in proper time did not arise. It was not filed 10 days before the beginning of the term of court, but good cause was shown for the failure so to do. The court there says: "Delay of the trial was not involved, for the trial was postponed by the court of its own motion for more than 30 days after the filing of the affidavit." In the case of Lewis v. United States the question of whether the affidavit was filed in time was not involved.

We think the expression of the court in Chafin v. United States (4th Circuit) 5 F.(2d) 592, 595, clearly states the reasonable construction of the statute: "The fair and reasonable construction of the statute is that, when the indictment is found 10 days or more before the term begins at which the case is to be called for trial, the affidavit must be filed 10 days before the beginning of the term, or good cause shown for the delay; when the indictment is found less than 10 days before such term begins, the affidavit must be filed as soon as practicable before the term begins, or good cause shown for the delay; when the indictment is found after the term has begun, the affidavit must be filed as soon as the disqualifying facts are known, or good cause shown for delay." Every case is governed to a large extent by the particular facts thereof. A defendant should not be compelled to try his case before a judge who has expressed prejudice against him. On the other hand, every consideration of fair dealing with the court requires that parties complaining of the prejudice must not make the statute a mere instrumentality for delay. That was not the purpose of its enactment. We are satisfied that under the facts of this record defendants waived the right of pro-

cedure conferred by section 21 of the Judicial Code.

[2] The indictment was based upon section 5209, Rev. Stat., which covers the willful misapplication of the funds of a bank which is a member of the Federal Reserve system with intent to injure or defraud such bank. Under this section two elements must combine to constitute the crimes charged in the indictment: (1) A misapplication of the funds of the bank; (2) a willful and felonious intent to, by such misapplication, defraud the bank. It is defendants' theory that the taxes paid, which are complained of in the first count, and the checks drawn by the Investment Company to the insurance companies and paid by the Globe Bank, of which defendants were officers, complained of in counts 2 to 8, inclusive, were in fact obligations that the bank was liable for; that consequently the payment of these various obligations could not constitute misapplication of funds; and that there could be no wrongful intent in so doing, and therefore that no crime was committed thereby. The defendants asked certain instructions on this theory of the case. They were not given. Defendants, of course, had the right to have their theory of defense fully presented. A failure so to do would constitute error. We do not, however, enter into this phase of the case, as, from a careful study of this record and a thoughtful consideration of every phase of the testimony, we feel compelled to face the question as to whether or not the court erred in not sustaining the motions made by all of the defendants at the close of the evidence to instruct a verdict of "not guilty." This requires a complete review of the testimony.

[3] In 1910 the Home Savings & Trust Company of Denver was organized, largely through the instrumentality of defendant Frank L. Bishop. Prior to that time said Frank L. Bishop had been in the insurance and loan business. After the organization of the Home Savings & Trust Company, this insurance and loan business was carried on as a branch of the bank's business, known as its "Insurance Department," handling the insurance business and real estate loans for clients. In 1923 the Home Savings & Trust Company merged with the Merchants' Bank of Denver and became the Home Savings & Merchants' Bank (hereafter designated the Home Bank). The insurance department continued as a branch of the bank. In 1924 this insurance department of the bank was incorporated under the name of the Home Insurance & Investment Company. This new company carried on the insurance business on the same floor as the bank and in the same manner as it had been carried on before its organization. It paid rent to the bank, apparently as a matter of bookkeeping, as it had been paid before, when the insurance business was concededly a mere branch of the bank.

The witness Mrs. Minty, who had been connected with the various insurance departments of the bank prior to the incorporation of the Investment Company and also thereafter, testified that the insurance department paid taxes really chargeable to the bank and that there was a substantial credit on the books of the insurance department as against the Home Bank for taxes paid, and that in July, 1925, the Investment Company had a credit against the bank of from $20,000 to $30,000 for items they had paid which were really chargeable to the bank. The entire issue of capital stock of the Home Insurance & Investment Company, with the exception possibly of qualifying shares for some officers, was issued to the Home Bank in payment for the real estate and insurance department of the bank. The new company occupied the quarters on the same floor as the Home Bank and was under the supervision and management of the officers of that bank. Its account was carried upon the books of the bank under the title "Insurance Department," and this insurance department was handled as a branch of the bank. July 6, 1925, the Globe National Bank of Denver merged with, or made arrangements for taking over the assets and assuming the liabilities of, the Home Bank. A written contract was entered into between the Globe National Bank and the Home Bank. Extracts therefrom, material here, are as follows:

"This agreement, made and entered into by and between Home Savings & Merchants' Bank, a banking corporation, hereinafter referred to as 'Home Bank' and the Globe National Bank, a banking corporation, hereinafter referred to as 'Globe Bank,' witnesseth:

"Whereas, in the opinion of Colorado state bank commissioner, the capital, surplus, and assets of the Home Savings & Merchants' Bank have been badly depleted, so that said Home Bank cannot with safety and within the provisions of the law continue in the banking business; and

"Whereas, overtures were made to the Globe National Bank to assume and agree to pay its outstanding obligations; and

"Whereas, as a condition precedent thereto, the Globe Bank required that cash, or its equivalent, in the sum of one hundred eighty-six thousand dollars ($186,000.00) be first provided or contributed by the directors and

stockholders of the Home Bank to the assets of said Home Bank as a part replenishment of the depleted assets of said Home Bank; and

"Whereas, certain directors and stockholders of Home Bank have complied with said condition and have advanced and contributed for the account of Home Bank the said sum of $186,000:

"Now, therefore, in consideration of ten dollars ($10.00) each to the other in hand paid, and other good and valuable considerations, receipt whereof is hereby acknowledged, it is mutually agreed by and between the Home Bank and the Globe Bank, as follows:

"1. Home Bank has assigned and transferred, and does by these presents assign and transfer, to Globe Bank its entire assets of every kind and character existing as of date July 4, 1925, except those certain choses in action listed and appearing on Exhibit A hereto attached, which said choses in action are retained and reserved as the property of the Home Bank.

"2. The Globe Bank accepts said assignment and delivery of the assets of said Home Bank as of date July 4, 1925, and hereby assumes and agrees to pay all outstanding obligations of every kind and character of Home Bank existing as of said date July 4, 1925."

Defendant Herman B. Gates was president of the Globe Bank. Defendant Will F. Bishop was its vice president. Defendant Frank L. Bishop was president of the Home Bank and later became vice chairman of the board of directors of the Globe Bank. At the time of the so-called merger of the two banks, the Investment Company was indebted to seven insurance companies for premiums collected between January and July, 1925, to the extent of from $25,000 to $30,000. Amounts had also been collected for customers; taxes deducted and deposited in the bank, but the same had not been checked out. The account of the Investment Company was apparently overdrawn at the time of the merger of the two banks, although Mrs. Minty, a government witness, testifies that such conclusion does not take into consideration a credit of $20,000 to $30,000 that the Investment Company was entitled to against the bank. The real situation as to this is not clear in the record.

After the combined banks had started in their business, demands were made upon defendants by the various insurance companies for the payment by the Globe Bank of the premiums which the Investment Company had collected and not remitted to the companies. Suits were threatened against the bank; likewise a receivership for the Investment Company. The attorney for the Globe Bank, Mr. Wright, was called in, and the matter was laid before him as to whether or not the Globe Bank was liable for these premiums, which the Investment Company had collected, and whether they should be paid by the bank; likewise the taxes. He examined the contract, which provided that the outstanding obligations of the Home Bank should be paid, and also provided that the entire capital stock of the Investment Company should be held by the Globe Bank until the indebtedness of such company in the sum of $45,000 should have been paid. Mr. Wright after an examination of the contract and consideration of the various phases of the situation, as counsel for the bank, advised defendant Gates that the Globe National Bank was liable for these insurance premiums.

Apparently the checks to the insurance companies to pay them had been drawn before that time, but had not been delivered. After the advice from Mr. Wright, the checks were delivered to the various insurance companies and were paid by the Globe Bank; said checks being the basis of all counts of the indictment, except the first. A national bank examiner, one George E. Armstrong, was fully conversant with all of the facts relating to the merger of the Home and the Globe National Banks, and approved the same. He made an examination of the Home Bank and the Investment Company and found them both in bad financial condition. Defendants Will F. Bishop and Herman B. Gates testified that at the time of the merger of the two banks they knew nothing of the unremitted insurance premiums and taxes. In order to secure the Globe National Bank for the moneys paid out on these checks, and upon advice of the bank's attorney, Mr. Wright, certain notes and securities of the Home Bank, not included in the assets turned over to the Globe National Bank, were retained as collateral, to be held until the indebtedness of the Investment Company to the bank had been paid. The Home Bank was so advised by a letter written by the bank's attorney, Mr. Wright, and signed by Mr. Gates. This letter was as follows:

"August 27, 1925.

"Home Savings & Merchants' Bank, Denver, Colorado—Gentlemen: We are handing you herewith the notes and securities as included in so-called Exhibit A, which is attached to the consolidation and merger contract dated July 4, 1925. This is in compliance with our understanding. However,

since assuming partial charge of the affairs of the Home Savings & Merchants' Bank and of the Home Insurance & Investment Company, we have discovered additional liabilities which were not included in the statement of July 4, 1925. This particularly pertains to the Home Insurance & Investment Company, which we found was indebted to the insurance companies for premiums collected for February, March, April, May, and June. As you undoubtedly know, the insurance companies several weeks ago insisted upon a settlement being made of these premium collections, and threatened drastic action. To avoid this, and after consultation with various members of your board of directors, this bank did pay the premiums collected in February, March, and April. This increased the indebtedness of the Home Insurance & Investment Company to the extent of $30,134.98.

"In addition to this, the Home Insurance & Investment Company is still indebted to the insurance companies for premiums collected during the months of May, June, and July. There are also due broker's commissions for insurance and surety bonds written during previous months. The exact amount of these obligations is not determined at this time, but an audit is now being carried on, which should show exact conditions. We feel that under the circumstances the notes and securities above mentioned should be held to protect this bank for the additional obligations which it has paid, and which it may through force of circumstances be required to pay in the future. Every possible effort is being made to collect in all accounts receivable because of insurance and matters of like nature. The audit may also disclose a better situation than is indicated above. In any event, proper credit is being given for all collections made, and this program will be carried out in the future.

"It may occur to you that there is some better way of handling this matter, whereby this bank can be reimbursed for the indebtedness due it from the Home Insurance & Investment Company, and, if so, we shall, of course, be delighted to co-operate with you.

"Yours very truly,
"Globe National Bank,
"By H. B. Gates, President."

Witness Armstrong, National bank examiner, testified in part as follows:

"Q. Now, do you know the attitude of the Comptroller of the Currency in the matter of overdrafts? A. Yes, sir.

"Q. What is that attitude? A. It is to discourage them as much as possible, but to be lenient with them, if the practice is not abused.

Redirect examination:

"Q. Was that privilege abused in this case? A. Well, in view of the emergency that existed, I would hardly think so."

The first count of the indictment relates to the payment of a check drawn by the Investment Company to the county treasurer and paid by the Globe Bank. These taxes were those of customers of the Home Bank. The insurance department of the bank was in the habit of collecting rent from various customers upon their properties, then remitting to the clients the money so collected, deducting the taxes which were to be paid. The money here deducted for taxes was deposited with the Globe Bank to the account of the insurance department.

In July, 1925, upon the merger of the two banks, the Globe National Bank, by the written contract hereinbefore referred to, assumed the liabilities of the Home Savings Bank. If at that time the Home Savings Bank was responsible for the insurance premiums collected by the Investment Company and for the tax money, then the Globe National Bank, by the merger contract, became responsible for their payment, and defendants, by paying said sums, would not be guilty of a criminal offense. The Investment Company was a corporate entity. Was it, however, a mere agency, instrumentality, or department of said Home Bank? The Home Bank owned practically the entire capital stock of the Investment Company, controlled its policies, and operated it as a department of the bank. It paid the salaries of its officers. Checks of the Investment Company were initialed by its officers. Witnesses Berg, Parks, Hawkins, and Cronin, all for the government, referred to the Investment Company in their evidence as "the insurance department of the bank." Mr. Fred W. Boot, Jr., cashier of the Globe National Bank, testified:

"The Home Insurance & Investment Company is on the same banking floor as the bank, but was generally known as the insurance department of the bank. They handled the ordinary insurance business of the bank, as well as some other business, and handled the various investments of customers of the bank, which went through that department. The account of the Home Insurance & Investment Company was carried upon the books of the bank under the heading of 'Insurance Department.'"

Mr. Underhill, bookkeeper for the Globe

National Bank and the Home Savings & Merchants' Bank, testified:

"Q. From January to July 6, 1925, the account of the Home Investment Company, so called, was carried as the insurance department on the ledger sheets? A. Yes, sir.

"Q. It was considered generally as the insurance department of the bank, was it not? A. Yes, sir.

"Q. And so carried on the books of the bank? A. Yes, sir."

It is well-settled law, as stated by this court in Chicago Mill & Lumber Co. v. Boatmen's Bank, 234 F. 41, 45, that "when one corporation owns or controls the entire property of another, and operates its plant and conducts its business as a department of its own business, or as its alter ego, it is responsible for its obligations incurred in so doing." This court, in Wabash Ry. Co. v. American Refrigerator Transit Co., 7 F.(2d) 335, 343, said: "If corporations carry on part of their business through subsidiary companies, it makes little difference what such companies may be called; there is no particular divinity surrounding the term 'corporation.' The courts will look through the form to get at the real intent of the association of individuals or corporations forming the organization, and if rights of third parties have not intervened, will give effect to the real purpose of the organization in order to promote square dealing and effectuate justice."

In United States v. Reading Co., 253 U. S. 26, 62, 63, 40 S. Ct 425, 434 (64 L. Ed. 760) the court says: "It results that it may confidently be stated that the law upon this subject now is that, while the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two, such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require." In Fourth Nat. Bank of Montgomery v. Portsmouth Cotton Oil Refining Corporation (C. C. A.) 284 F. 718, the court held that, if one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability for its acts.

[4] It seems unnecessary to cite many cases from the abundance of authority to show that the courts, in situations where one corporation is subsidiary to and owned and controlled by another, look through mere names to learn the real relationship between the corporations, and if there is practical identity will disregard the mere formal separation into legal entities. So. Pac. Terminal Co. v. Int. Comm. Comm., 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310; United States v. Del., Lack. & West R. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438; Chicago, M. & St. P. Ry. Co. v. Minn. Civic Assn., 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Chicago & C. Ry. v. Des Moines & C. Ry., 254 U. S. 196, 41 S. Ct. 81, 65 L. Ed. 219; Lehigh Valley R. Co. v. Dupont (C. C. A.) 128 F. 840; The Willem Van Driel, Sr. (C. C. A.) 252 F. 35.

[5] It is interesting to consider the legal aspect of the situation. If the insurance companies to whom the premiums were due had brought action against the Investment Company and the Home Bank prior to the merger for the premiums collected, and the exact evidence had been introduced in such cases that was introduced in this by the government, could there be any doubt that the question of the liability of the Home Bank would have been at least a question for the jury? Certainly a court could not have instructed a verdict in favor of the Home Bank. It is entirely probable that the evidence would have justified a court in instructing a verdict for plaintiffs. In any event, the evidence would have been sufficient to have warranted submitting the question to the jury, and if the jury had found the Home Bank liable under the evidence, certainly a court would not have disturbed that verdict. If that situation existed in July, 1925, as to these claims, and at the time the Globe Bank assumed the liabilities of the Home Bank, it would seem that these claims would be legitimate ones against the Globe Bank. Extending the illustration a little further, if the insurance companies had brought suit against the Home Savings Bank and the Globe National Bank to recover these premiums, could there be any doubt that there was sufficient evidence to make the question one for the jury, at least as to the liability under the merger contract of the Globe Bank and the Home Bank for these insurance premiums? We think not. Can it be possible that the officers of the Globe Bank, defendants here, acting upon advice of their counsel in paying claims for which a jury in a civil action

might find the bank liable, become criminals subject to long terms in the penitentiary?

The general course of dealing, and the fact of intercorporate officers, might suggest that the purchase of the Home Bank and the assumption of its liabilities by the Globe Bank were a part of a fraudulent or wrongful scheme to assist the defendants in misapplying the funds of the Globe Bank. That is the only theory whatever, it seems to us under this evidence, by which criminal liability could be asserted. No such contention, however, is made by the government. Indeed, the so-called contract of merger was made with the full approval of Mr. Armstrong, a national bank examiner.

[6] The government suggests that the contract between the Globe Bank and the Home Bank was ultra vires. It is claimed by defendants, and not denied, that the Home Bank was a state institution and authorized to carry on an insurance business. Of course, the Globe Bank had no such authority, and the relationship of the Globe Bank to these premiums does not arise by virtue of any arrangement made between the Globe Bank and the Investment Company, but only by reason of the assumption of the liabilities of the Home Bank, and the liability of that institution for the acts of the Investment Company as its agent and instrumentality. Under the doctrine laid down by this court in Schofield v. State Nat. Bank of Denver, Colo., 97 F. 282, the contract of merger here was not ultra vires. See, also, George v. Wallace (C. C. A.) 135 F. 286; American Nat. Bank of Macon v. Commercial Nat. Bank of Macon (D. C.) 246 F. 721; Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738.

The whole tenor of the instructions was to the effect the the Globe National Bank had not assumed the obligations of the Investment Company. The trial court, referring to the written agreement, said to the jury: "But there is nothing in this agreement by which the Globe National Bank as such assumed in any way the liabilities or the assets, or agreed to pay the debts, of the Home Insurance & Investment Company." That is, of course, true. There was no contract between the Globe Bank and the Investment Company as to any assumption of the debts of said company. True, it held its capital stock to secure the payment of the $45,000 which the Investment Company owed the bank. The relationship of the Globe Bank to the payment of these premiums arises out of the contract of merger made with the Home Bank, and not out of any agreement between the Globe Bank and the Investment Company. The Investment Company, with its stock owned entirely by the Home Savings Bank, was evidently a mere instrumentality of said bank for conveniently transacting certain parts of its business.

Government counsel in its brief fails to meet this question at all, and fails to recognize any liability on the part of the Home Bank for the debts incurred by the Investment Company. It may be, as charged by counsel for the government, that the officers of the Globe Bank did not understand said bank had assumed any debts of the Insurance Company, at least up to the time they were so informed by their legal counsel. It may be that defendant Herman B. Gates did state that he wanted to take over the business of the Insurance Company if he could get it on the right terms, and that the bank refused to enter into a contract presented by the representatives of the Insurance Companies for the bank to assume and agree to pay the debts of the Investment Company. Apparently defendants Herman B. Gates and Will F. Bishop knew nothing of these obligations for insurance premiums until after the merger. Whether defendant Frank L. Bishop did, or not, the record fails to disclose. It is probable he did.

Concluding as we do that, under the evidence disclosed by this record the Home Savings Bank was responsible for the insurance premiums and for the tax money (the basis of the eight counts of the indictment), or that at least it was a question for a jury if civil action were brought, we are forced to the conclusion that in the payment of the insurance premiums owed by the Investment Company neither the misapplication of funds, as charged, nor the necessary criminal intent, was proven beyond a reasonable doubt. The same is true as to check for taxes, although one feature of count 1, to which we now refer, demands separate consideration and determination:

If defendant Frank L. Bishop paid taxes on his own property, for which he alone was liable, out of the funds of the bank, it was, of course, a violation of law. If the other defendants participated therein with intent to defraud the bank, they also violated the law. It is claimed in the argument of government's counsel that such is the fact. The evidence is not clear on this question. We have examined the record closely, and there is grave doubt whether or not this is the fact. We are unable to determine it from the record. Therefore we think this question remains in the case for retrial.

[7] This court has often taken the position that, where the evidence in a case is as con-

sistent with innocence as with guilt, a conviction cannot be sustained. In Grantello v. United States, 3 F.(2d) 117, 118, this court said: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." Willsman et al. v. United States (C. C. A.) 286 F. 852; Sullivan v. United States (C. C. A.) 283 F. 865; Edwards v. United States (C. C. A.) 7 F.(2d) 357. We are thoroughly convinced that as to all counts, except the first, the evidence in this case is as consistent with innocence as with guilt. Certainly the government has failed as to these counts to prove its case beyond a reasonable doubt.

The motion for instructed verdicts of "not guilty" as to all of the defendants should have been sustained as to counts 2, 3, 4, 5, 6, 7, and 8. Defendant Herman B. Gates having been acquitted on these counts, the matter is immaterial as to him. As to the first count, were it not for the testimony tending to show payment of taxes of Frank L. Bishop out of the funds of the bank, the motions as to that count should also have been sustained; but, as we have before indicated, the question of whether or not the taxes of Frank L. Bishop were paid out of the funds of the bank is not clear from the record, and, as at present advised, we conclude that question should be retried. Therefore, as to the first count, the judgment as to all the defendants is reversed, and the case as to that count is remanded, with instructions to proceed in harmony with this opinion.

The judgments of conviction as to all the defendants on all the counts are set aside, and the cases as to all the defendants are reversed and remanded.