## LONG v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit. March 7, 1928.

No. 7942.

1. **Banks and banking** ⟐288½—**Evidence held insufficient to take to jury prosecution for misapplication of funds of member bank of Federal Reserve Bank (12 USCA § 592).**

Evidence *held* insufficient to take to jury prosecution for misapplying funds and moneys of member bank of Federal Reserve Bank, under Rev. St. § 5209 (12 USCA § 592), where defendant loaned personal credit to bank to assist it in obtaining loan, for which bonds belonging to bank were pledged as security, and proceeds went to credit of bank and were used for its benefit.

2. **Banks and banking** ⟐288½—**Misapplication of funds with intent to defraud must be shown, in prosecution for misapplication of funds of member bank of Federal Reserve Bank; "willful misapplication" (12 USCA § 592).**

In prosecution for misapplication of funds of member bank of Federal Reserve Bank, brought under Rev. St. § 5209 (12 USCA § 592), misapplication of funds and moneys of bank to use of defendant, and willful and felonious intent to defraud bank, must be shown; "willful misapplication," within such statute, being one for use or benefit of party charged with intent to injure and defraud.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Willful Misapplication; Willfully Misapply.]

In Error to the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

W. H. Long was convicted of misapplying funds and moneys of a member bank of the Federal Reserve Bank of Kansas City,

Mo., and he brings error. Reversed and remanded.

Elmer B. Silvers, of Kansas City, Mo. (Silvers & Silvers, of Butler, Mo., on the brief), for plaintiff in error.

S. M. Carmean, Asst. U. S. Atty., of Kansas City, Mo. (Roscoe C. Patterson, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and JOHN B. SANBORN, District Judge.

KENYON, Circuit Judge. Plaintiff in error was convicted in the District Court of the United States for the Western District of Missouri on the second and third counts of an indictment containing nine counts, charging various violations of the statutes of the United States relating to national banks. Count 2 of the indictment charged plaintiff in error and one Wilson, as president and cashier, respectively, of the First National Bank of Adrian, Mo. (hereafter designated Adrian Bank), a member bank of the Federal Reserve Bank of Kansas City, Mo. (hereafter designated the Federal Reserve Bank), which Federal Reserve Bank was duly organized and established under the act of Congress known as the Federal Reserve Act (38 Stat. 251), with unlawfully misapplying the funds of said banking institution, by converting certain Liberty Bonds, of the value of $5,000, to the use and benefit of said plaintiff in error, by delivering the same without the knowledge or consent of the Adrian Bank to the Fidelity National Bank & Trust Company of Kansas City, Mo. (hereafter designated Fidelity Bank), as collateral security for a certain loan of $17,000 made to said plaintiff in error by said bank, and evidenced by a certain promissory note, and that said plaintiff in error and said Wilson unlawfully, willfully, and designedly, with intent to injure and defraud the said Adrian Bank, ordered and directed said bonds to be sold and the proceeds thereof applied in part payment of the said note of said plaintiff in error to the said Fidelity Bank.

The third count of the indictment charged that plaintiff in error and Wilson, as president and cashier, respectively, of the said Adrian Bank, wrongfully misapplied certain moneys of said bank, to wit, $13,890, the specific manner of such misapplication being that said plaintiff in error and Wilson, without the consent of the bank or its board of directors, and with intent to defraud said bank, caused a note to be executed in the sum of $13,890, by said Adrian Bank in favor of the Federal Reserve Bank and received thereon as a loan to said Adrian Bank the sum of $13,890, which sum they willfully and unlawfully, with intent to injure and defraud said Adrian Bank, applied to the payment of a certain note in the amount of $17,000 executed by said plaintiff in error individually to the Fidelity Bank.

Both counts relate to the same note to the Fidelity Bank. The second count is based on misapplication of funds; the third on misapplication of money.

At the close of the government's case, and also at the close of all the evidence, motions to instruct verdicts of not guilty on counts 2 and 3 were overruled. The jury found plaintiff in error guilty on these counts and acquitted him as to the other seven counts. The sentence was three years in the penitentiary on each count, the same to run concurrently.

[1] A number of questions are raised by the assignments of error, but in view of the conclusion we reach there is no necessity of considering any, except the decisive one, to wit: Should the motion for an instructed verdict as to counts 2 and 3 of the indictment, made at the close of all the evidence, have been sustained?

There is little dispute in the essential facts shown by the evidence. The Adrian Bank was a small bank, with a capital of $25,000 and a surplus of about $17,000. Plaintiff in error became its president January 1, 1918. He had had no experience in banking, but owned some stock in another bank in Adrian. He was the owner of farm lands, and had some $25,000 in money deposited in various banks. Before his advent into the financial world as a bank president, a Mr. Mathers and a Mr. Allen were in active charge of the bank; Mr. Allen being cashier. Prior to the time plaintiff in error became president a number of loans in excess of 10 per cent. of the capital and surplus of the bank had been made. Large amounts of this paper had been rediscounted at the Fidelity Bank and also at the Federal Reserve Bank. During the war the Adrian Bank purchased (or acted as agent for purchasers) a large number of so-called government Liberty Bonds, as was customary among the banks of the country. The books of the bank failed to show any large amount of such bonds owned by the bank at any time, although it was in testimony that such bonds were purchased and sold at various times to customers of the bank; some paying in full therefor and some only partially.

October 16, 1920, the Adrian Bank bor-

rowed from the Federal Reserve Bank $17,-000, giving a note therefor. At that time it was owing the Federal Reserve Bank, in addition to large amounts on rediscounts, a note of $5,312.50, which was secured by $6,-250 of Liberty Bonds, the property of the Adrian Bank. Approximately $20,000 of Liberty Bonds of various issues were deposited with the Federal Reserve Bank as security for the $17,000 note. These bonds were owned by the stockholders, officers, directors, and customers of the Adrian Bank, in just what proportion the record does not clearly disclose; but it is conceded that for the purposes of this case, as between the bank and plaintiff in error, these bonds were the property of the bank. The two notes held by the Federal Reserve Bank were renewed every 15 days. In November, 1920, the Adrian Bank had overdrawn its account with the Fidelity Bank to the extent of $18,000 to $20,000. The Fidelity Bank sent its agent, J. C. Williams, to Adrian to try to straighten the matter out. Mr. Allen, Mr. Wilson, and Mr. Williams sorted out $18,000 to $20,000 of notes in the Adrian Bank, which they thought could be rediscounted at the Federal Reserve Bank. In due course these notes reached the Federal Reserve Bank, but it refused to rediscount them, unless the two notes held by it of the Adrian Bank, viz. one for $5,312.50 and one for $17,000, were paid. The Fidelity Bank sent two notes in blank to be signed by the Adrian Bank, being in the exact amounts of the notes which had been given by the Adrian Bank to the Federal Reserve Bank. The record is not entirely clear on the question, but we think it fairly appears that these notes were signed by W. H. Long, as president of the bank, and sent to the Fidelity Bank.

On November 24, 1920, Allen and plaintiff in error went to Kansas City to look into the state of these matters. On November 22, 1920, the notes which had been sorted out by Allen, Wilson, and Williams and sent to the Federal Reserve Bank were rediscounted by that bank in the amount of $17,951.84, the proceeds thereof credited to the Adrian Bank account, and the two notes of $5,312.50 and $17,000 of the Adrian Bank to the Federal Reserve Bank were debited to that account and thus paid. The bonds held by the Federal Reserve Bank were thereupon released and delivered to the Fidelity Bank, and were in its hands when plaintiff in error and Allen went to Kansas City on November 24, 1920. The overdraft in the Adrian Bank with the Fidelity Bank at that time amounted to some $27,928. For some reason the Fidelity Bank

did not care to take the notes signed by the Adrian Bank, and the notes so signed, which had been sent to the Fidelity Bank, were not used. Plaintiff in error testifies that no banks in Kansas City would take the notes of the Adrian Bank, and that the Fidelity Bank insisted upon his personal note. Plaintiff in error at that time gave two notes, dated November 22, 1920, signed by himself, one for $5,312.50 and the other one for $17,000, to the Fidelity Bank, and the Liberty Bonds which had been used as collateral with the Federal Reserve Bank in the sum of $26,250, and which had been delivered to the Fidelity Bank by the Federal Reserve Bank, were placed as collateral to secure these two notes. The Fidelity Bank deposited the entire proceeds upon discount of these notes to the credit of the Adrian Bank in the sum of $22,-183.60. This took up the overdraft in the account, and left a credit balance for the Adrian Bank. The $17,000 note is the note out of which this case arises; the government claiming that both notes were personal notes of plaintiff in error, and plaintiff in error claiming that in giving them he was merely loaning his personal credit to the bank, to assist it, and that the entire matter was a transaction for the benefit of the bank.

September 2, 1921, these notes being renewed every 30 days, the $6,250 of bonds were sold for $6,129.30, and the amount applied in payment of the $5,312.50 note, and some interest on the $17,000 note. There was a surplus of $826.31, which was passed to the credit of the Adrian Bank. The $17,-000 note was renewed at various times until November 3, 1921. At that time $5,000 of the bonds, which had been part of the collateral security, were sold for $4,947.19, and the proceeds applied on the note and interest, reducing it to $12,096.78. Coincident with this payment the Adrian Bank borrowed $13,800 of the Federal Reserve Bank, and the remaining $15,000 of bonds which had been delivered to plaintiff in error were placed with the Federal Reserve Bank as collateral security to the note given for said amount. The entire proceeds of this $13,890 loan were credited by the Federal Reserve Bank to the account of the Adrian Bank. The balance of $12,096.78 on the $17,000 note to the Fidelity Bank was paid by a draft, which it is fair to conclude from the record was drawn against the account of the Adrian Bank in the Federal Reserve Bank. This note in the Federal Reserve Bank was paid by the sale at various times of the bonds placed as collateral, the amounts being credited on the note; the last sale and

credit being December 26, 1922, which was after plaintiff in error had ceased to be president of the Adrian Bank. This completed the payment of the note.

There is no controversy presented in the briefs as to the applicable law. The indictment is under section 5209 of the Revised Statutes (12 USCA § 592), which provides:

"Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

[2] There must be two elements to constitute the crimes charged in counts 2 and 3, viz.: (1) Misapplication of funds and moneys of the Bank to the use of plaintiff in error; (2) a willful and felonious intent by such misapplication to defraud the bank. Bishop v. United States (C. C. A.) 16 F.(2d) 410; United States v. Northway, 120 U. S. 327, 7 S. Ct. 580, 30 L. Ed. 664. The willful misapplication referred to in this statute has been defined by the Supreme Court in United States v. Britton, 107 U. S. 655, 668, 2 S. Ct. 512, 27 L. Ed. 520, as follows: "We are, therefore, of opinion that the willful misapplication of the moneys and funds of the banking association, which is made an offense by section 5209, means something different from the acts of official maladministration referred to in section 5239 [12 USCA § 93], and it must be a willful misapplication for the use or benefit of the party charged, or of some person or company other than the association, with intent to injure and defraud the association or some other body corporate or some natural person."

In Dow et al. v. United States, 82 F. 904, 906, in discussing a violation of the statute,

this court said: "To complete a misapplication of the funds of the bank, it was necessary that some portion thereof should be withdrawn from the possession or control of the bank, or a conversion in some form should be made thereof, so that the bank would be deprived of the benefit thereof." United States v. Martindale (D. C.) 146 F. 280; United States v. Steinman (C. C. A.) 172 F. 913; Adler v. United States (C. C. A.) 182 F. 464; Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830.

The government insists as to both counts that the $17,000 note executed by plaintiff in error to the Fidelity Bank was his personal note. That is the meat of this entire controversy, and the vital question in the case. If it was his personal note, given for his own benefit, and not for the bank's, then the securing of credit thereon by the sale of the $5,000 of bonds at his direction was a willful misapplication of the funds of the bank, to its detriment, and plaintiff in error's benefit.

As to the third count, if the money or credit secured by borrowing the $13,890 from the Federal Reserve Bank by the Adrian Bank was used at plaintiff in error's direction to pay a personal note of his, and was not used for the benefit of the bank, it was a misapplication of the money of the bank, and intent to injure the bank would be presumed.

The government attempted to meet this issue by proving that, practically coincident with the execution of the notes by plaintiff in error to the Fidelity Bank, there was an entry made on the teller's blotter of the Adrian Bank, debiting the Fidelity Bank with the amount of these notes, and at the identical time an entry was made in the account of plaintiff in error in the Adrian Bank, crediting him with a like amount, and that that credit remained until some time in April, 1921, when it was transferred to another special account denominated "W. H. Long, Personal." We pass the somewhat doubtful question as to the admissibility of this evidence, in view of the fact that the indictment does not allege these facts as part of the method employed to misapply the money and funds of the bank (Batchelor v. United States, 156 U. S. 426, 15 S. Ct. 446, 39 L. Ed. 478; United States v. Britton, 107 U. S. 655, 2 S. Ct. 512, 27 L. Ed. 520), and for the purposes of this discussion accept said evidence as admissible.

It appears that against this credit there are three debits, as follows:

April 29, 1921................... $ 1,793.03
April 29, 1921...................   3,500.00
March 30, 1922...................  12,432.30

These debits were all for bank matters, and there was no evidence that they represent any funds withdrawn from the bank by plaintiff in error, or in fact by any one. The first one was a charge for certain Liberty Bonds which the bank had bought from customers, carried as cash items. The second was a balance of a worthless note of a customer of the bank, which was a loss, and the account was used to charge off the same. The third represented an accumulation of rediscounted paper charged back to the Adrian Bank by the Fidelity Bank. There is testimony that, when the bank was taken possession of by the federal officials, plaintiff in error was overdrawn some $3,500, for which amount he gave a note. This evidence might tend to show, taken alone, that plaintiff in error had profited by the transaction; but, considering all the evidence together, any such presumption we think could not prevail. Mr. Wilson testifies that plaintiff in error knew nothing about this account, and, while it is difficult to believe that he did not, yet the government failed to contradict the testimony both of plaintiff in error and Wilson that plaintiff in error never checked anything out of this account and never received a cent therefrom.

The credits on the books to plaintiff in error's personal account were as to him purely fictitious—as testified to by Wilson—a mere bookkeeping entry. These credits did not represent any transactions inuring to plaintiff in error's benefit, but were transactions of the bank. The entire history of this matter shows we think conclusively that the notes given by plaintiff in error to the Fidelity Bank in the sum of $5,312.50 and $17,000 were given for the Adrian Bank; that plaintiff in error was trying to save the bank by loaning to it his personal credit. They did not represent any personal transaction on the part of plaintiff in error, and the proceeds thereof went to the credit of the Adrian Bank and were used for its benefit. The money borrowed from the Federal Reserve Bank was borrowed in the name of the Adrian Bank, and that money went to pay the balance on the $17,000 note to the Fidelity Bank, which, as we have said, was the note given, not for the personal accommodation of plaintiff in error, but to assist in the effort to save the bank.

If the two notes sent to the Fidelity Bank by the Adrian Bank on November 23, 1920, signed by that bank, had been accepted by the Fidelity Bank, this case would not have arisen as to counts 2 and 3. The notes signed by plaintiff in error took the place of these two notes, and the Adrian Bank received all the credit for the proceeds thereof. The record fails to show that plaintiff in error profited by any of these matters. Evidently, although the notes were secured by the bonds as collateral, plaintiff in error had some financial standing, and the Fidelity Bank preferred his personal notes to notes of the bank. We cannot escape the conclusion from this record that the note of $17,000 given to the Fidelity Bank was in effect a note of the Adrian Bank, and that of necessity leads us to the further conclusion that the motion for directed verdict as to counts 2 and 3 should have been sustained.

There were probably in the operation of this bank, as disclosed by the record, some violations of the federal statutes. The jury has found plaintiff in error not guilty on seven charges of such violations. We are confined entirely to the charges of the second and third counts. The manipulation of the bonds of the customers was an unwarranted and high-handed performance, and the appearance at times and disappearance at others on the books of the bank of credit for these bonds, the issuance of certificates of deposit to the owners of the bonds without knowledge thereof upon their part, and the marking of many of them paid by plaintiff in error, show a maladministration of the affairs of this bank. We think, however, the particular manipulation of bonds and of moneys charged in the second and third counts resulted in no loss to the bank, although the government insists that it did, because the bank is now liable for certain of these bonds to its customers. That is probably true, but it has escaped liability for an amount equaling, if not exceeding, that in its indebtedness to the Federal Reserve Bank and the Fidelity Bank. There has been a shifting of its liability.

The history of plaintiff in error's connection with the Adrian Bank confirms our conclusion that the bank has really suffered nothing by virtue of the particular transactions we have been discussing, and that there was no willful intention on the part of plaintiff in error to injure the bank by these transactions. Plaintiff in error's venture into the financial world has proven a tragedy for him. He was apparently a reasonably prosperous farmer, owning some 400 acres of land and having $25,000 deposited in various banks. His boy had been taken from the clover fields and made a clerk in the bank. It it apparent that the bank was having a difficult struggle to exist when plaintiff in error came into it. There were already signs

of impending trouble. He was permitted to' purchase 5 shares of stock. Evidently his vanity was touched by the supposedly high honor being conferred upon him by making him president of the bank, and he proceeded to check into the bank moneys he had deposited in various other banks, with little knowledge apparently of the condition of the bank at that time. The directors were doubtless glad to have a president who had $25,000 that could be turned into the coffers of the struggling bank. While plaintiff in error has undoubtedly learned considerable about the banking business in the four years of his presidency, he apparently had no qualifications as a banker at the time he was selected for president. At the conclusion of his four years' experience as president of this little bank his farm is gone; likewise his $25,000; he has passed through the bankruptcy court, and now finds himself confronted with a three-year sentence in the penitentiary, and so beset with poverty that the trial court found he was entirely without financial means or property, and permitted him to prosecute this writ of error without costs to him. Thus closes his venture in the realms of finance. As there was no willful misapplication of the moneys and funds of the Adrian Bank for the use or benefit of plaintiff in error, the judgment on both counts of the indictment is reversed, and the case is remanded to the District Court for further proceedings in harmony with this opinion.

Reversed and remanded.