## READ v. UNITED STATES (two cases).
### Nos. 8768, 8769.

Circuit Court of Appeals, Eighth Circuit.

July 2, 1930

Emmet Tinley, of Council Bluffs, Iowa (Edson R. Sunderland, of Ann Arbor, Mich., Tinley, Mitchell, Ross & Mitchell, of Council Bluffs, Iowa, and James A. Devitt, of Oskaloosa, Iowa, on the brief), for appellants.

E. G. Davis, Sp. Asst. to Atty. Gen. (Ross R. Mowry, U. S. Atty., of Newton, Iowa, on the brief), for the United States.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

Appellants, Thomas H. Read and Elbert A. Read, whom we will refer to as defendants, were convicted in the United States District Court for the Southern District of Iowa, upon one count of an indictment charging misapplication of funds of the First National Bank of Shenandoah, in violation of section 5209, Revised Statutes of the United States as amended (12 USCA § 592).

Other counts of the indictment charged them with various misapplications of the funds of the bank, and with making false reports to the Comptroller of the Currency.

Henry Read was also indicted, but a verdict of not guilty was directed by the court as to him upon all counts.

A motion to quash and set aside count 6 was sustained at the commencement of the trial.

The jury found defendants not guilty on counts 1 and 2, guilty on count 3, and disagreed on counts 4 and 5; counts 7, 8, and 9 were not urged by the government, and a motion for directed verdict as to them was unopposed.

The case is here on appeal from the conviction on count 3, which is as follows:

"And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present:

"That at all times mentioned in this Count, the First National Bank of Shenandoah, Iowa, was a National Banking Association, organized and existing, and in operation

and doing business under and by virtue of the laws of the United States concerning national banks, was then and there a member bank of the Federal Reserve Bank of Chicago, in Federal Reserve District No. 7 and is hereinafter referred to as 'said member bank'; that at all times mentioned in this Count, Thomas H. Read, late of the said City of Shenandoah, Iowa, was an officer and agent, to-wit: President of the said member bank; that at all times mentioned in this Count, Elbert A. Read, late of the said City of Shenandoah, was an officer and agent, to-wit: Vice President of the said member bank; that at all times mentioned in this Count, Henry Read, late of the said City of Shenandoah, was an officer and agent, to-wit: Vice President and Cashier of the said member bank:

"That heretofore, to-wit: on the 18th day of July, A. D. 1925, in the said City of Shenandoah, State of Iowa, Southern District of Iowa, Southern Division, and within the jurisdiction of this Court, the said Thomas H. Read and the said Elbert A. Read and the said Henry Read, who are hereinafter referred to as 'defendants', being then and there officers and agents of the said member bank as aforesaid, did, wilfully, unlawfully and feloniously, and with intent, then and there, on the part of each of them to injure and defraud the said member bank, misapply certain of the moneys, funds and credits of the said member bank, (a more particular description of said moneys, funds and credits, being to the Grand Jurors unknown) of the amount and value of Six Thousand ($6,000.-00) Dollars, and did convert the same to the use, benefit and advantage of the said Thomas H. Read, in the manner following, that is to say:

"By virtue of the power of control, direction and management, which the said defendants as officers and agents aforesaid of the said member bank, possessed over the moneys, funds and credits thereof, they the said defendants did, on the 22nd day of August, A. D. 1924, knowingly, wilfully and unlawfully deposit in and credit to the individual ledger account in the said member bank of the said Thomas H. Read, the aforesaid sum of Six Thousand ($6,000.00) Dollars of the moneys, funds and credits of the said member bank, (a more particular description of the said moneys, funds and credits, being to the Grand Jurors unknown) and did, on the same date, to-wit: the said 22nd day of August, A. D. 1924, charge a General Ledger account in the said member bank, known and referred to as 'Dividend Account' with two

certain false, fictitious and duplicate checks which falsely purported to be dividend checks in the sum of Three Thousand ($3,000.00) Dollars each, one of said checks being of the tenor following, to-wit:

"The First National Bank of Shenandoah
"Shenandoah, Iowa, Jan. 1, 1921.
1261
"No. ~~13452~~
"Pay to the Order of T. H. Reed $3,000
Three Thousand # Dollars
"Dividend #91     Elbert A. Read
"Cashier President

—and the other of the said checks being of the tenor following, to-wit:

"The First National Bank of Shenandoah
"Shenandoah, Iowa, Jan. 1922   No. 13453
"Pay to the order of T. H. Read $3000—
Three Thousand Dollars
"Dividend #93     Elbert A. Read
"Cashier President

—and the said defendants, after the said sum of Six Thousand ($6,000.00) Dollars had been deposited in and credited to the account in the said member bank of the said Thomas H. Read, as aforesaid, to-wit: on the said 18th day of July, A. D. 1925, did, wilfully, unlawfully and feloniously, and with intent on the part of each of the said defendants, then and there, to injure and defraud the said member bank, convert the aforesaid sum of Six Thousand ($6,000.00) Dollars of the moneys, funds and credits of the said member bank, (a more particular description of said moneys, funds and credits being to the Grand Jurors unknown) to the use, benefit and advantage of the said Thomas H. Read, by charging the account of the said Thomas H. Read in the said member bank, with the sum of Nine Thousand One Hundred Twenty ($9,120.00) Dollars and by crediting the like sum to the First National Bank of Coin, Iowa, on the books of the said member bank, and which said charge of Nine Thousand One Hundred Twenty ($9,120.00) Dollars of the moneys, funds and credits of the said member bank, (a more particular description thereof being to the Grand Jurors unknown) to the said account of the said Thomas H. Read in the said member bank created an overdraft therein and which said credit to the said account of the said First National Bank of Coin, Iowa, created an obligation on the part of the said member bank to pay to the said First National Bank of Coin, Iowa, the said sum of $9,120.00, whereby the moneys, funds and credits of the said member bank were depleted in the aforesaid and included

sum of $6,000.00; and the grand jurors further say that the said credit of $9,120.00 so placed as aforesaid to the credit of the said First National Bank of Coin, Iowa, on the books of the said member bank, was on the 17th day of October, 1925, wholly withdrawn by the said First National Bank of Coin, Iowa, from the control, custody, possession and ownership of the said member bank."

A motion to direct a verdict of not guilty upon a number of grounds was made at the close of the testimony, one of which was:

"Because upon the entire record the testimony fails to sustain the charges made in the indictment and does not exclude all other reasonable hypothesis' of innocence; and because, upon the whole record, a verdict of guilty could not be said to be sustained by the facts and circumstances which are at least as consistent with innocence."

Of the various questions here presented and argued, two are of predominant and decisive importance, and to these we confine our discussion. (1) Should the court have sustained the motion to instruct a verdict for defendants on the third count because of absence of substantial evidence of any intention to injure the bank, and because all the evidence in the case was as consistent with innocence as with guilt? (2) Was there prejudicial error in the argument to the jury of the Special Assistant to the Attorney General of the United States in·charge of the prosecution of the case?

██ The law applicable to the first proposition is well settled in this circuit. In Salinger v. United States, 23 F.(2d) 48, 52, this Court said: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and, where all the evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the accused." Edwards v. United States (C. C. A.) 7 F.(2d) 357; Bishop v. United States (C. C. A.) 16 F.(2d) 410; Partson v. United States (C. C. A.) 20 F.(2d) 127; Van Gorder v. United States (C. C. A.) 21 F.(2d) 939; Union Pacific Coal Co. v. United States (C. C. A.) 173 F. 737.

██ To constitute the crime charged in count 3, there must have been (a) a willful misapplication of the money and funds of the bank for the use and benefit of the defendants; (b) an intent to injure or defraud the bank. Bishop v. United States (C. C. A.) 16 F.(2d) 410; Long v. United States (C. C. A.) 24 F. (2d) 946.

The court in its instructions to the jury, referring to the alleged misapplication of funds, said:

"And if it was not done willfully, although it was done, then you could not find the defendants guilty, and even though there was a misapplication, as charged, but if it was done without the intention to injure and defraud the bank, then you could not find the defendants guilty. For instance, if it was done by the officers, or an officer, in the honest exercise of his judgment, then you could not say it was done wilfully, or with intent to injure or defraud, or if not any reason it was not knowingly done, or knowingly wrongful, or if the intent was any other than to injure or defraud the bank, the defendants would not be guilty, although all of the other elements existed. * * *

"If all of the evidence in the case is just as consistent with innocence as with guilt, then you would have to acquit the defendants. The evidence must be more consistent with guilt than with innocence, and must satisfy you there is no other theory than guilt that can be reached in the exercise of your reason and judgment."

These statements are in harmony with the decisions heretofore cited.

██ We test this case by these well-settled principles of law. This requires a somewhat extended discussion of the evidence.

Thomas H. Read was president of the First National Bank of Shenandoah, Iowa, from 1877 until the date of closing of the bank May 13, 1926. For many years he had owned 300 of the 500 shares of its capital stock, and had actively participated in the management of the bank. At the time of the trial he was 88 years of age. The other defendant, Elbert A. Read, was his son. For some years, and covering the time involved in this prosecution, he owned 20 shares of the capital stock, and was vice president of the bank. He had been an executive officer thereof for 25 years. Henry Read, as to whom a verdict was directed, was another son of Thomas H. Read.

The bank during these years was paying its usual dividends, and at Christmas, 1922, Thomas H. Read gave to each of his daughters, Mrs. Dell R. Sunderland, of Ann Arbor, Mich., and Luella J. Read, of Grinnell, Iowa, a present of a dividend check of $3,000, issued to him by said bank as a dividend upon his 300 shares. On account of the financial'

stringency in the Mid-West he requested his daughters not to cash these checks. In March, 1923, said Thomas H. Read was in a serious physical condition, and had determined to go to a hospital at Ann Arbor, Mich., for an operation, thinking that, while the chances were probably against him on account of his age, he might pull through. March 9th he worked around the bank, although suffering much pain and discomfiture. The bank cashier had died a week previous, and the affairs of the bank seemed to be in a somewhat confused condition. On the evening of March 9, 1923, Thomas H. Read left for Ann Arbor That day he talked to his son Elbert A. Read concerning dividend checks which he thought he had coming to him, stating: "I am trying to find my dividend checks. I have three of them, or ought to have three of them and I only find one here." In response to his son's effort to induce his father to go home from the bank so he could be ready for the train, he said: "I want to look up this dividend matter first." The son advised him that there was not time to do this; that he would look it up and send the checks on to him by the morning train. The father said: "I find dividend 94 but there are two prior to that." The check which he had found for dividend No. 94 in the sum of $3,000 he gave to his son and asked him to credit it to the account of Ermina J. Read, the wife of Thomas H. Read, as he might be gone for a long while. The next day Elbert A. Read executed two dividend checks for $3,000 each on dividends numbered 91 and 93, and sent them to his father at Ann Arbor.

As to the check drawn on dividend No. 91, which was dated January 1, 1921, defendant Elbert A. Read, scratched through the stamped number (13452) on the check, and inserted in his own hand the number 1,261, which was the number borne by the original check against this dividend which had been paid on May 27, 1921, the day after its issue.

The other duplicate check here involved was drawn on dividend No. 93, and its number was 13,453. It was dated January 1, 1922, though really issued in March, 1923. These checks were received by Thomas H. Read in the hospital at Ann Arbor after he had undergone his first operation. On the next day he was to have a final operation, and, while in bed awaiting the same, he indorsed these two checks, giving one to his daughter, Luella J. Read, and the other to his daughter Mrs. Dell R. Sunderland, and asked them, as he had done with relation to the checks given them for Christmas in 1922, not to cash the same until the financial situation became better.

This duplication of these two dividend checks was not discovered apparently until some three years later. The defendants testified that they did not know of it until after the closing of the bank in May, 1926.

Thomas H. Read returned from the hospital in April, 1924, and then wrote to his daughters, asking them to exchange the dividend checks which he had given them for his promissory notes. This was done, and he gave his promissory note for $6,000 to each of them. The daughters returned the four checks to him about May 1, 1924. Mr. Read did not deposit them until August 22, 1924.

A national bank examiner, Mr. Layborn, visited and examined the bank in August, 1924, and ordered a large amount of paper, amounting to some $90,000, charged out as losses. There was no place to charge these losses without impairing the surplus fund of the bank, which the Reads felt could not be reduced more than $50,000 without danger to the bank. The bank at this time was having trouble concerning certain notes executed by one McClure, and these two matters somewhat intertwine. A portion of his paper had been charged off, but the bank still held some of his notes as live assets. The bank held collateral in the form of Florida land, upon which, however, a mortgage foreclosure was pending, and, in order that the collateral be of any avail to the bank, it was necessary to protect from this foreclosure. The First National Bank of Farragut, Iowa, had purchased one of McClure's notes which was secured by the same collateral. It required some $5,000 to redeem from the mortgage on the Florida land. The Reads then devised the plan that Thomas H. Read was to borrow on his personal credit in New York as much as he could to protect the McClure collateral, and to take care of the bank losses above the $50,000, which they decided to take from the surplus. It was agreed that if anything later was realized from the McClure notes it should be used to pay the McClure indebtedness carried on the books of the bank and also the note held by the Farragut Bank, the balance to go to Thomas H. Read as a partial reimbursement for the money he was to advance to take care of the loss above $50,000 on the charged-off paper and also the amount paid to protect the McClure collateral. This plan seems to have been discussed at a meeting of the board of directors of the bank, but no official action was taken thereon.

On August 22, 1924, Thomas H. Read deposited four dividend checks for $3,000 each (two of which were the duplicates) which had been returned to him by his daughters, raising his credit balance to $20,558.51. He held a high balance until December 26, 1924, when, having borrowed $20,000 on his personal credit from the Mechanics' & Metals National Bank of New York, he deposited this to his account, making his balance $45,208.36. This was sufficient to meet the portion of the charge-off which the bank could not take care of. On the day of the deposit of the $20,000, his account in the bank was charged with items aggregating $28,137.50 to cover the check-off paper demanded by Examiner Layborn. These charged-out items remained in the bank and came into the possession of the receiver. A contract with reference to the McClure indebtedness and the foreclosure on the Florida land was entered into either January 10, or February 10, 1925, between the Shenandoah Bank, Thomas H. Read, and Elbert A. Read on the one hand, and Carl C. McClure on the other.

February 16, 1925, Thomas H. Read out of his personal account paid $4,925 to redeem the mortgage on the McClure land. To protect the McClure collateral and take care of the charged-off paper, Thomas H. Read turned in to the bank some $33,062.50 (the $28,137.50 and the $4,925). When the McClure notes were collected, the Shenandoah Bank and the Farragut Bank received payment for the paper they were carrying, and $24,000 was returned to Thomas H. Read. Out of this transaction, in order to enable the bank to meet the Layborn charge-off and to save the McClure collateral, Thomas H. Read was a loser to the extent of $9,062.50 (the $33,062.50 less the $24,000 received). The McClure transaction was the basis of the charges in counts 1 and 2 of the indictment, upon which both defendants were acquitted.

On June 3, 1925, another national bank examiner, Hadlock, ordered certain items in the bank's assets totaling some $50,000 charged out. The profit and loss account at that time showed an overdraft of $2,756.53. The surplus had been reduced to $100,000, a result of the Layborn enforced check-off. Thomas H. Read had maintained his credit balance from December, 1924, to June, 1925, at amounts between $17,000 and $30,000.

The Reads asked for time from the examiner to see if they could not personally take care of these losses, which was granted. The defendants thereupon opened an account in the Shenandoah Bank in the name of Iowa Securities Company in order to better handle the matter. June 27, 1925, Thomas H. Read transferred $20,000 to this account, and Elbert A. Read $15,000, from their individual accounts. $34,616.74 of notes held by the bank which had been ordered charged out by the examiner were credited to bills receivable, and charged to this Iowa Securities Company account. Later additional items were charged against it, which exhausted it. While these notes remained in the bank as charged-off assets, and were produced by the receiver at the trial, it was the agreement with the examiner in granting additional time to the Reads that they were to be unconditionally removed from the assets of the bank.

In October, 1925, Examiner Wilson made an examination of the bank and ordered out some more bad paper. The profit and loss account at that time was under $2,000, and a very small per cent. of the losses could therefore be charged to it. Examiners Wilson and Hadlock ordered the defendants to sell the stock they had in the Imogene Bank and give the sum realized from one J. L. Gwynn, who bought the same, to the bank. This transaction netted $9,200, and was credited to the profit and loss account. Later it was found that more money would be necessary to take care of the bad paper ordered to be charged out of the bank by Examiner Wilson, and Thomas H. Read executed a bond obligating himself to furnish the bank with the necessary amount of money. This was credited at $4,000 in the profit and loss account of the bank. On April 26, 1926, this was paid by charging $4,000 to the individual account of Thomas H. Read in the Shenandoah Bank.

After the entry of the credit of $12,000 on August 22, 1924, which covered the two duplicate dividend checks of $3,000 each, Thomas H. Read's credit balance did not drop below $6,000 until June 29, 1925.

On July 18, 1925, the date selected by the government as showing misapplication of the $6,000 (the amount of the two duplicate checks) his account showed an overdraft of $3,000.84, occurring by the payment of a check of his drawn in favor of the First National Bank of Coin in the sum of $9,120. This amount was credited to the First National Bank of Coin on the books of the First National Bank of Shenandoah. This credit was withdrawn by the Coin Bank on the 17th day of October, 1925, when its account with the Shenandoah Bank showed an overdraft of $284.54.

At about the time that the $9,120 was taken out of the Thomas H. Read account, the sum of $6,316.60 came into it. There is some

dispute in the evidence as to the exact time, defendants claiming that the account retained a credit balance of $3,315.17 on July 18, 1925, instead of having the overdraft alleged in the indictment, so that a balance greater than the $3,000 derived from the excess dividend payments remained intact in his account, and that the bookkeeper had made a mistake in not entering the deposit of $6,-316.60 which came into the bank on July 18th with that day's items, but entered it on Monday July 20th.

From August 22, 1924, when the duplicate checks were deposited, there was no time up to July 18, 1925, when Thomas H. Read's credit balance was below $3,000. Dividend check No. 1323 for $3,000, drawn on dividend No. 95, due to Thomas H. Read, was never received by him. It was in the bank at the time it was taken over by the receiver.

Much testimony was introduced, consisting of oral evidence and exhibits. We have endeavored to state the major facts sufficiently to give a picture of the transactions involved. Is this evidence more consistent with guilt than with innocence?

The government contends that the McClure matter, which we have briefly set forth, throws light on the conduct of defendants as involved in the charge under count 3; that Thomas H. Read wrongfully appropriated to his own use a portion of the money paid in by McClure on his indebtedness, which in fact belonged to the bank; that defendant Elbert A. Read juggled the $30,000 paid July 18, 1925, by virtue of a credit ticket which indicated that there was on that date a ledger account in the bank known as "C. C. McClure Settlement," but that no such account could be found after the receiver took possession; that the item of $28,386.17, which with the item of $1,612.83, made up the $30,000 received from McClure on July 18, 1925, was deposited, as discovered by the accountant, as a credit to the general ledger account known as "Miscellaneous Banks"; that the entire $30,000 should have been credited to the McClure settlement account instead of $1,613.83; that this balance of $28,386.17 had been credited on June 27, 1925, 22 days before it had been received by the bank; and that the alleged misapplication went to the credit of Thomas H. Read.

The reply to this by defendants is that the balance as claimed by the government was credited "on June 27, 1925, 22 days before it had been received by the bank," but that in no other way could there have been a compensating credit for the charge of $28,595.94 made

on June 27, 1925, in the "Miscellaneous Bank Account." Referring to the contract claimed to have been made between Thomas H. Read and the bank that he should be reimbursed out of any money coming in from the McClure settlement for moneys he had advanced from personal funds to take care of the notes out charged, the court said to the jury: "You are instructed, gentlemen of the jury, if such an agreement was made in good faith between E. A. Read and T. H. Read, and that T. H. Read did put up the money as agreed, when the McClure money came in E. A. Read had the right to credit that money to T. H. Read, and it would not be the money of the bank when McClure paid it, and you would have to find a verdict for the defendants on counts one and two, if you found that contract existed and performed, as I have stated."

The jury found a verdict for defendants on these two counts. Hence they must have found that the contract existed, as claimed by defendants, and was performed. We must accept the conclusion of the jury that the Read version of the McClure transaction is correct, and therefore there is nothing therein to throw any light on the conduct of defendants as to the matters covered by the third count. The verdict of the jury exonerates the Reads' connection with the McClure transaction from any charge of illegality. It is not an act of similar character to that set forth in count 3, and has no bearing on the question of wrongful intent. The jury's verdict on counts 1 and 2 blots the McClure transaction out of the picture.

The government insists that it has shown other acts of a similar character in the issuance of certain duplicate dividend checks to one Earl Sheets. About January 21, 1920, Sheets gave his promissory note for $6,000 to Thomas H. Read in payment of 10 shares of stock of the First National Bank of Shenandoah. The dividends were to go to Thomas H. Read in payment of interest on the note. When the dividend checks, signed by Elbert A. Read, were issued, Sheets indorsed his over to Thomas H. Read, but testifies that he paid no attention to these dividends. The record shows two duplications in dividend checks to Sheets, one as to dividend No. 89, and one as to dividend No. 90. The original check, No. 1997, was drawn against dividend No. 89 in favor of Earl Sheets for $100 dated "7—22—1920" and stamped paid "7—23—1920." The check which is now shown to be a duplicate had "duplicate" written across it. It had the same number, was for the same amount, but was dated

"7—1—1920," and stamped paid "5—27—1921." Check No. 2013, date "7—22—20," amount $100, stamped paid "7—23—20," was the original check in payment to Sheets of dividend No. 90. The duplicate check was No. 1298, date "7—1—21," stamped paid "5—27—21," amount "$100," and had "duplicate" written across it. This check, while dated July 1, 1921, was stamped paid May 27, 1921.

It is urged that defendant E. A. Read, as to duplicate check 1997 issued on dividend No. 89, must have known he was issuing an irregular check, because he made the number of the duplicate check conform to the original, and that he must have had the original check before him or the dividend register of the original.

The testimony as to the duplications of the two dividends to Sheets is the strongest evidence in the case to support the government's theory of wrongful intention of the Reads as to the issuance of the duplicate checks, on which count 3 is based. The fact that the Sheets duplicate check on dividend No. 90 was stamped paid May 27, 1921, and apparently issued July 1, 1921, is an unpleasant circumstance for the Reads to explain. Some of the force of this evidence is lost by the fact that there were four dividend checks on dividend Nos. 92, 93, 94, and 95, payable to Sheets which had not been delivered, and were in the bank at the time it closed. All of these dividends were to be turned over to Thomas H. Read under his contract with Sheets, to be credited on the note. It does not seem reasonable to conclude that the Reads were conspiring in 1920 and 1921 to collect duplicate checks representing $200, when later they did not take the trouble to collect the $400 of dividends for subsequent years which were in the bank for many years uncalled for. The Sheets transactions are the only ones urged as tending to show similar transactions on the part of the Reads to the alleged crime charged in count 3. They are circumstances showing acts of a similar character, and do bear, of course, on the question of whether the duplications charged in count 3 were intentional or were a mistake.

It appears that a duplication of dividend checks had occurred on March 10, 1917, when a duplicate was issued to one G. W. Gwynn on dividend No. 74. This was, however, shown to be a mistake, and the government does not urge this as having any bearing on the question of intent in this case.

What as to the duplicate checks in the sum of $3,000 each issued on dividends No. 91 and No. 93? They are the two checks that were sent by Elbert A. Read on March 9, 1923, to his father at the Ann Arbor hospital. The government insists that Elbert A. Read must have known when he wrote these checks that they were spurious; that in issuing the check on dividend No. 91 he scratched through the stamped number, 13,452, and inserted in his own handwriting the number 1261, which was the number borne by the original check against this dividend, and which had been paid the day after issuance; that, while he made the check out in March, 1923, he dated it January 1, 1921; that he could not have secured the number 1261 unless he had seen the original check or the dividend register, and therefore it is a fair inference that he knew he was issuing a false and fictitious check.

The second duplicate check did not have the number 13,453 scratched out. Hence the same argument made by the government as to the check on dividend No. 91 would not apply to this one.

There is controversy in the record as to who last had one of the dividend registers. There were two of them—one was in evidence; the other was not. Its production might have thrown light on the question of whether or not the duplicate checks were necessarily intentionally wrongful and not mere mistakes. Defendants claim the same was in the bank after the receiver took charge; one government witness testifying she saw the same "right at closing of the bank or shortly afterwards" lying on the desk where she had left it. Henry Read testifies he saw Sheets working on it after the bank closed. The record is unfortunate in not containing the dividend register. There is testimony that as to the lost dividend register the dates would be shown when the dividends were declared, the number of the check authorized to be issued on the dividend, the name of the payee, and the date when each check was paid, but that in fact the dates of payment were not always entered. One of the pages of the dividend register, photostat of which was in evidence (Exhibit 47), showed that the column "When Paid" had no entries therein. Therefore it cannot be accepted as a certainty that the missing dividend register would show whether or not the dividend checks issued had been paid. The dividend register may have shown in March, 1923, when E. A. Read wrote the duplicate checks that Thomas H. Read was entitled to check No. 1261 on divi-

dend No. 91 but there is no certainty that it showed that the check had been paid. We think no presumption under the evidence can be indulged as to the contents of this lost or misplaced dividend register.

The bank also had a dividend ledger, and, while this would show the check numbers, it would not show upon what dividend any particular check was drawn.

It is the contention of the defendants that, if Elbert A. Read had made an examination of the bank records on March 9, 1923, to look up the dividend checks due to his father, he would have found as to dividend No. 91 which had been declared and was payable December 31, 1920, check No. 1261, a defective record in the dividend ledger showing an entry of $3,000 paid to his father on May 27, 1921, without any check number to show that the entry referred to this check or dividend, and that the examination would have led to the conclusion that check 1261 had not been paid and was then due to Thomas H. Read; that, as to dividend No. 92, check No. 1277, there was no record showing the check had ever been delivered or paid (this was the check which was in the hands of the daughter Luella J. Read, given her at Christmas time, which check had never been paid or presented for payment); that, as to dividend No. 93, check No. 1293, there was no record showing the check had ever been delivered or paid (this check was in the hands of Mrs. Sunderland as a Christmas gift from her father); that, as to check No. 1307, dividend No. 94, the check was being put through the bank as a deposit to the account of Mrs. Thomas H. Read, and that full information could be secured as to it; that, as to dividend No. 95, check No. 1323, no record existed in the books of the bank showing its delivery or payment (this is the check that was never taken out of the bank, and came into the hands of the receiver). The condition of affairs in this bank shows an extreme carelessness in handling dividend checks. The evidence discloses that these checks were not sent out regularly to the stockholders. One witness testifies as to seeing them lying around the bank on desks and in other places. If mere carelessness in operating a bank were a crime, the Reads would certainly be guilty.

Thomas H. Read had made a hurried search for dividend checks to which he thought he was entitled before his departure for the Ann Arbor hospital, and at that time there were two undelivered checks due him of $3,000 each to cover dividends No. 94 and No. 95. According to the letter of Elbert A. Read to his father he (the father) had told the son that he was entitled to two dividend checks, one for dividend No. 91 and the other for dividend No. 93 respectively, of date January 1, 1921, and January 1, 1922. His actions were not those of a man who was seeking to have duplicate checks issued to him. Apparently he thought certain dividends belonging to him had not been paid. There was no premeditation in the matter—no secrecy.

It is apparent there was some confusion in the bank around March 8 and 9, 1923. The cashier had died about a month previous. Thomas H. Read was leaving for a hospital to have a serious operation performed. To a man of his years the prospect was not an alluring one. Naturally he was nervous and worried about the situation. His son was worried because of his father's condition. All these circumstances enter into the consideration as to the intent and motive in what they did in relation to these duplicate checks. It does not seem reasonable that if the Reads deliberately intended to injure the bank and to appropriate this money to their own use and benefit that Thomas H. Read would later have left one of his regular dividend checks in the bank for the sum of $3,000. The government argued as to this that it was done for the sake of appearance only and would help them in their claims that the dividend checks in question were inadvertently issued. The $3,000 to which he was entitled would have paid one of these checks, so that the amount received wrongfully in that event from the bank would have been $3,000.

It is not consistent with common sense that, if defendants had discovered they had issued these duplicate checks, thus possibly incurring a criminal liability, when Thomas H. Read made additional deposits, as he did in large amounts, he would not have corrected this matter, which could easily have been done. It is not reasonable to believe that, in view of all they had done to keep the bank going, the Reads would have gambled with chance to wrongfully secure $3,000 and run the risk of criminal prosecution and severe punishment. It is not in harmony with human nature and paternal affection that Thomas H. Read, 82 years of age, on a sick bed with the probability that he might pass away as the result of an impending operation, would give his daughters a present of checks which he knew to be spurious, and which would be a source of trouble to them.

The entire method of carrying on this bank by the Reads over a long period of time cannot be ignored in considering the evidence as bearing on wrongful intent. The record shows that from December 26, 1924, to April 26, 1926, Thomas H. Read and Elbert A. Read turned over to the Shenandoah Bank about $57,000 of their own funds to assist the bank and help it carry on, the amounts being as follows:

| December 26, 1924 to | | |
|---|---|---|
| February 16, 1925, | by Thomas H. Read.. | $ 9,062 52 |
| June 27, 1925, | by Thomas H. Read.. | 20,000 00 |
| June 27, 1925, | by Elbert A. Read.... | 15,000 00 |
| Dec. 14, 1925, | by Thomas H. Read.. | 4,600 00 |
| Dec. 14, 1925, | by Elbert A. Read.... | 4,600 00 |
| April 26, 1926, | by Thomas H. Read.. | 4,000 00 |
| Total | | $57,262 52 |

The government claims that some of the advances made by defendants were merely the purchase of slow and doubtful paper. The paper the examiners demanded be charged off was to be eliminated from the assets of the bank, the customary way of doing which would be to charge it out of the book assets of the bank so that, while it remained property of the bank and was in the bank when it was taken over by the receiver, it was not carried on the books of the bank as assets. Surely the Reads were not buying worthless notes to the extent of $50,000. They were advancing the money to try and save the bank. The record does not justify the claim that they were merely buying slow and doubtful paper. Of course, Thomas H. Read was the heavy stockholder, and in helping the bank he was also helping himself, but nevertheless he seems to have done everything he possibly could to keep the bank going. He maintained large balances in his account for the use and benefit of the bank on which he received no interest. He borrowed money and paid interest on it in order to keep these large balances. He urged his daughters to withhold the cashing of the checks in order that the bank could have the use of the money. After the issuance of these duplicate checks he deposited large sums in the bank. In fact, the government was unable to find misapplication until over a year thereafter because his balances exceeded the amount which it is claimed he had misapplied.

That there are suspicious circumstances in connection with this matter is apparent: The mere issuance of the duplicate dividend checks, a challenge to honesty; the stamping of some dividend checks as paid before the date of supposed issuance; the failure to list the spurious checks as dividend checks, and the placing of the names of his daughters on the deposit ticket; the stating to Sheets and other witnesses, by Elbert A. Read, that the bank was too hard up to pay dividends, and that the bank was not going to declare dividends, when in fact it was doing so; the duplication of dividend checks to Sheets.

It is the government's theory that the Reads had been so successful in the Sheets transactions and in covering up the same and had profited to the extent of $200 thereby, that they took it upon themselves on a larger scale to plunder the bank of $6,000. The theory is ingenious, but cannot fairly stand on this record. The Reads had put over $57,000 into this bank to save it. They were exhausting their personal resources in the attempt. The total of the amounts advanced by them to keep the bank going was more than the capital stock of the bank. It is not reasonable to suppose that in the face of this they were willfully endeavoring to defraud the bank out of $3,000, which is the amount the bank actually lost. As long as banks are conducted by human beings, mistakes will occur. It is a matter known to all who reside in the Middle West that, during the years in which these transactions in controversy arose, the banking business was in a precarious condition, due to the agricultural depression; that banks with frozen assets and business undermined by the shrinking values of farm lands, were having great difficulty to keep going. Hundreds of them were unable to withstand the financial storm and went down. The Reads were doing all they could to weather the storm, and probably went beyond the line of legitimate banking in some of their transactions. It does not appear that they had any marked losses prior to the agricultural depression. The defendants went upon the witness stand and testified freely as to all their transactions with the bank.

This is not a bank-looting case, and, while the record shows an almost inexcusable carelessness in the method of handling the affairs of the bank, and some circumstances tend to create suspicion, it does not show, in our judgment, any motive or intent on the part of the Reads to injure the bank, or to secure personal profit wrongfully for themselves. The facts and circumstances do not exclude any other hypothesis than defendants' guilt as to count 3. We are satisfied that all the evidence is as consistent with the theory of innocent mistake as with the theory of a willful intentional misapplication and appropriation of the bank's

funds. Therefore, under well-established rules of law heretofore stated, the judgment of conviction cannot stand.

We refer briefly to another question raised on this appeal as to certain statements made in the closing argument to the jury by the Special Assistant to the Attorney General of the United States. He said:

"The entire Read fortune grew up out of and had its origin in the First National Bank of Shenandoah, Iowa, and if my information is correct, it is a very substantial fortune. I think the law of the sea should prevail in a case of this kind the same as it does at sea. The law of the sea requires that the captain of the ship, in case of disaster, shall stay on the bridge of his ship until every passenger who has entrusted himself to his care shall have reached safety before the captain himself shall seek safety, otherwise the captain must go down with his ship. The Read family, and by the 'Read family' I mean every member of the Read family, should have turned over their entire fortune to pay the depositors of this bank every cent that they had entrusted to the care of the Read's bank. The Read women should have stripped their jewels from their persons, and not a shingle should have been left over their heads, unless and until every depositor was paid in full."

The argument of counsel for defendants is not in the record; therefore we are unadvised as to whether this was said in reply to some argument advanced by said counsel. There is nothing to indicate that it was as in Hoffman v. United States (C. C. A.) 20 F.(2d) 328. There was no evidence that the Read family had a fortune, or that the Read women had any jewels. Latitude must be allowed for the effect upon a prosecutor of the heat engendered during the trial of a case, but argument must be restrained within reasonable limits. This case was well and skillfully prosecuted. It is apparent from the affidavits in the record of various parties that feeling against the Reads was running high. Prejudice against them was intense, and it was difficult for defendants in this atmosphere to secure a fair trial. Parties who see their lifelong savings lost in a bank failure are not in a condition of mind to do justice to those whom they believe may have caused that loss, and deep-seated prejudice against officers of a failed bank is most natural. It is the duty of a prosecuting attorney to assist in giving a fair trial to a defendant. The government cannot afford to convict its citizens by unfair means. The argument referred to was a subtle and powerful appeal to the prejudice of a jury. Counsel went outside of the evidence to convey to the jury the idea that the Reads had a fortune; that they kept it while innocent depositors suffered; that they saved themselves, contrary to the law of the sea, and did not go down with the ship, but continued to possess their jewelry and fortune. Such an argument was clearly prejudicial. The case was a close one on the facts, as is evidenced by the various verdicts of the jury on different counts of the indictment. This appeal was undoubtedly a most persuasive influence with the jury to convict the defendants on some count, and was such prejudicial error as to make the trial, in our judgment, an unfair one.

The Supreme Court of the United States in a rather recent case, in reversing the judgment because of the argument of counsel, said: "The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice." New York Central Railroad Co. v. Johnson, 279 U. S. 310, 318, 49 S. Ct. 300, 303, 73 L. Ed. 706.

This was a civil action, and it is much more important that prejudice be not aroused in a criminal action than it is in a civil one. No exceptions were taken to the remarks of the prosecuting attorney, but, as held in the New York Central R. R. Case, supra, where paramount considerations are involved, "the failure of counsel to particularize an exception will not preclude this Court from correcting the error." This court in Van Gorder v. United States, 21 F.(2d) 939, 942, said on this subject: "In criminal cases involving the life or liberty of the accused the appellate courts of the United States may notice and correct, in the interest of a just and fair enforcement of the laws, serious errors in the trial of the accused fatal to the defendant's rights, although those errors were not challenged or reserved by objections, motions, exceptions, or assignments of error." On the general subject of improper argument to the jury, see Nations v. United States (C. C. A.) 32 F.(2d) 598; Skuy v. United States (C. C.

A.) 261 F. 316; Beck v. United States (C. C. A.) 33 F.(2d) 107.

The judgment of conviction as to both defendants is set aside, and the case is remanded to the trial court for further proceedings.

Reversed and remanded.